Fred Douglas COE, Plaintiff-Appellant,

v.

YELLOW FREIGHT SYSTEM, INC., Defendant-Appellee.

No. 79–1635.

United States Court of Appeals, Tenth Circuit.

Argued March 6, 1981.

Decided April 20, 1981.

Fred Douglas Coe, plaintiff-appellant, pro se.

John J. Kitchin, Swanson, Midgley, Gangwere, Thurlo & Clarke, Kansas City, Mo. (Robert W. McKinley, Swanson, Midgley, Gangwere, Thurlo & Clarke, Kansas City, Mo., and J. Nick Badgerow, McAnany, Van Cleave & Phillips, Kansas City, Kan., with him on the brief), for defendant-appellee.

Before SETH, Chief Judge, and McWILLIAMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This action arises under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e et seq., which is commonly known as Title VII of the Civil Rights Act of 1964. The complaint alleged that Yellow Freight had discriminated against the plaintiff because of his race. He is black. Plaintiff has alleged that:

*First*, he was not promoted to the job of safety manager at defendant's home office in August, 1974; and,

*Second*, that he received his undergraduate degree from college on or about May 15, 1975, but was not offered the safety manager's position or admitted into the company's management training program; and

*Third*, that in June of 1975 the company refused to transfer him to any other position during the evening or graveyard shifts to permit him to attend law school during the day.

The § 1981 case resulted in a verdict for the defendants, and a motion for new trial was denied by the trial court. The trial court heard the Title VII claim based on the evidence that was given to the jury in the § 1981 case, and the court's findings and conclusions were in favor of the defendants on the Title VII issue. The appeal to this court is on both claims.

Plaintiff started work for the defendant in August of 1968 in Denver, Colorado, in the Defense Transport Division, and was transferred to Kansas City in August of 1969, when the Defense Transport Division was relocated to that city. In December, 1969, this division was phased out, and plaintiff was assigned to work in the Steel Hauling Division and Thermol Division in Kansas City. At first he was hired as a log clerk, and his duties involved auditing drivers' logs to insure that special hauling divisions complied with all government regulations concerning hours and miles driven, physicals, drivers' licenses, and that sort of thing. His title was later changed to "safety assistant," but he performed the same duties. Plaintiff also acted as a dispatcher over a period of two years, and had some dealings with owner-operator lease agreements. He spent about three weeks at a later time doing field work with the drivers: talking with them in the field. However, he had no experience in driving trucks, hiring drivers, qualifying or training drivers, or investigating accidents. He had not been involved with grievance hearings, labor law, OSHA requirements or matters having to do with hazardous materials. Nevertheless, he was involved with safety matters involving drivers' logs.

One Ken Thompson assumed the position of Safety Director after the person who had held that position, Mr. Rust, died. Thompson, who had previously served with one Jim Norman as one of two safety managers under the direction of the former director, continued after the death of Rust to exercise the responsibilities for all safety matters east of the Mississippi River and mat-

ters involving OSHA, and Norman continued to be responsible for all safety matters west of the Mississippi River and for hazardous materials. Although plaintiff sought the job of safety manager vacated by Thompson, he did not receive the job because the position was not filled. Instead, Thompson and Norman continued to perform this work, notwithstanding the fact that Thompson was the Safety Director as well. The position of safety manager vacated by Thompson has not been filled up to the time of the trial and this appeal.

Plaintiff attended night school at Rockhurst College in Kansas City, and finally graduated from that institution. The defendant company paid for his tuition and books under its educational assistance program. Prior to graduating from Rockhurst, plaintiff applied for admission to law school with the University of Missouri at Kansas City. Following his graduation from Rockhurst College he requested that the company admit him to its management training program, for which a college degree was a prerequisite. However, Yellow Freight refused to admit plaintiff to that program, saying that there were no openings at that time.

In May of 1975 plaintiff was notified that he was accepted into law school, provided that he would take the summer preparatory program. Toward the end of May, he approached various people at Yellow Freight and requested to be transferred to a job within the company which would allow him to work nights and attend law school during the day. He was told that there were no openings in any department on either the evening shift or the graveyard shift. He started law school, nevertheless, on June 9, 1975, and during the week of June 9th he reported to work at Yellow Freight to help his replacement in his former job as log clerk and safety assistant. The following week he took his accrued vacation. He was paid fully for that week and for the two weeks of his vacation, and when he returned to Yellow Freight on June 23rd, he was told by the defendant that he had no job; that he had quit to attend law school.

## I.

### THE ISSUE IN THE CASE

[1] The main question hinges on the Title VII claim. There are also some problems pertaining to the § 1981 claim which we will consider. However, the main issue is whether, under the two principal approaches to a Title VII claim, namely, the *disparate treatment approach*, and the *disparate impact approach*, the evidence supports a violation of Title VII whereby liability exists. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). It is to be understood that these two approaches to employment discrimination are not treated as separate claims for relief, but as alternate grounds for recovery. The definitions of disparate treatment and disparate impact are found in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In that case a claim of disparate treatment was said to embody a situation where "the employer simply treats some people less favorably than others because of their race, color, religion or national origin." *Id.* at 335, n. 15, 97 S.Ct. at 1854, n. 15. A claim of disparate impact exists when "employment practices that are basically neutral in their treatment of different groups in fact fall more harshly on one group than another and cannot be justified by business necessity." It is necessary, therefore, to consider whether plaintiff has any right to relief on either of these theories in the light of the evidence in the case.

The questions, thus, are whether the plaintiff was given disparate treatment or whether the policies of the company were such that they had a discriminatory impact on black people in general and on Coe in particular.

### Disparate Treatment

■ This requires a discriminatory motive or intent. To establish a prima facie case of disparate treatment as a result of the employer's failure to hire, transfer or promote, plaintiff must show that (1) he applied for an available position; (2) he was qualified for the position; and (3) he was

rejected under circumstances which gave rise to an inference of unlawful discrimination in that his failure to be hired, transferred or promoted is more likely than not based on considerations of impermissible factors.[1] *Texas Department of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If Coe established a prima facie case a presumption would be created that Yellow Freight unlawfully discriminated against him because of his race. *Id.* Yellow Freight could then rebut this presumption by meeting its burden of production, by articulating a legitimate, non-discriminatory reason for failure to promote or transfer Coe. *Id.* The burden specifically falls upon Coe to demonstrate that the reasons offered by Yellow Freight are mere pretexts for discrimination, and thus that Yellow Freight intentionally discriminated against Coe on account of his race. *Id.* Proof of this latter factor may be enunciated by statistical evidence which is indicative of a general pattern or practice of discriminatory policies on the part of the employer. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973).

*Did the Plaintiff Show That He Received Disparate Treatment by Yellow Freight?*

*Denial of promotion to safety manager position*

■ Plaintiff alleges that he was discriminated against in that he was not promoted to the position of safety manager. His evidence is weak, however, on two grounds. First, because there was not a position open, in that there had been a decision not to hire anybody to fill the safety manager position. Second, his evidence is insufficient from the standpoint of his qualifications to be a safety manager. The plaintiff takes the position that there was a position open when Rust passed away and Thompson was promoted to the position of safety director. Apparently the decision not to fill the position which Thompson held and which he continued to carry on even though he was Safety Director is not shown to be based upon discriminatory motives. Seven years have passed and the position has not been filled. As far as plaintiff's qualifications to assume the duties of the position are concerned, the evidence shows that plaintiff was not as qualified as Thompson or Norman. Thompson had taught English, health, physical education and drivers' education in high school for three and one-half years; he had a Bachelor of Science Degree in education, and a Master's Degree in safety. Also, he had six and one-half years experience with the Indiana State Patrol in motor carrier inspection and trucking regulations, and had served as a driver superintendent for Yellow Freight for five years. So Thompson's background and training fully justified his selection as both safety manager and Safety Director. Norman's

1. This should not be confused with the typical "pattern and practice" action brought by the EEOC against an employer under 42 U.S.C. § 2000e–6(d). *See e.g., Hazlewood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States, supra.* In a true "pattern and practice" suit, the government is not required to show individual discrimination with respect to each person for whom it seeks relief when establishing its prima facie case. *International Brotherhood of Teamsters v. United States, supra,* 97 S.Ct. at 1866–67. In seeking to protect the public's interest, it is sufficient that the government show specific evidence of company discrimination regarding some of the employees that it seeks to represent, and that the government establish that a broad-based policy of employment discrimination existed. *Id.* The latter factor provides sufficient grounds to create a prima facie inference that individual hiring decisions were made in pursuit of the general discriminatory policy. *Id.* When an individual plaintiff seeks to prove one instance of unlawful discrimination, however, he must first show that he, himself, was denied a job for which he was qualified. *McDonnell Douglas v. Green, supra,* 411 U.S. 792 at 804–805, 93 S.Ct. 1817, 1825–1826, 36 L.Ed.2d 668; *International Brotherhood of Teamsters, supra,* 431 U.S. at 358, n. 44, 97 S.Ct. at 1866, n. 44. *Texas Department of Community Affairs v. Burdine, supra,* —— U.S. at ——, 101 S.Ct. at 1095, citing *McDonnell Douglas,* 411 U.S. at 804–805, 93 S.Ct. at 1825–1826. This is true even if plaintiff claims that his individual discrimination resulted from the Company's broad-based pattern and practice of discrimination.

qualifications are less strong than those of Thompson, but are more strong than plaintiff's. Norman had been a Missouri State Highway Patrolman, a driver for Yellow Freight, and a driver superintendent for Yellow Freight. However, Mr. Coe had not had any experience in driving trucks or supervising truck drivers or investigating accidents. In any event, plaintiff was not competing with Norman for the position as safety manager. Indeed, he was not competing with anyone since the company made a decision to abolish the job, and there is no evidence that this decision was made in bad faith.

In our view plaintiff has not made a prima facie showing of discrimination with respect to his claim regarding Yellow Freight's failure to promote him to the position of safety manager, since plaintiff has not shown that a position was available for which he was qualified. Thus, we fail to see that he has shown the existence of disparate treatment.

### Failure to Allow Transfer to a Nighttime Position

■ The next contention of the plaintiff is that Yellow Freight discriminated against him by failing to transfer him to an evening or nighttime position within the company. Does this meet the disparate treatment test? The evidence shows that during the time that Coe was seeking to work nights, the only vacancies available were for two experienced keypunch operators and a rate clerk. Coe does not contend that he was qualified for either of these positions. Therefore, again, Coe has not made a prima facie showing that he applied for an available position for which he was qualified.

### Denial of Admission to Management Training

■ Similarly, plaintiff also failed to establish a prima facie case of disparate treatment because of the refusal to admit him into the management training program. The evidence shows that at the time Coe applied for that program no trainees had been brought into the program for several months prior to the time that Coe requested admittance to the program, and no trainees were enrolled during the time that Coe was seeking admittance. The evidence also shows that during that period there had been a general decline in Yellow Freight's business which had resulted in layoffs, and a net loss of employees at Yellow Freight's general offices.

We must conclude that the plaintiff failed to offer any evidence of discriminatory acts against him even though some months after this the company did assign a white man to this training program. The evidence does not show that there were positions available during the time that Coe applied to be admitted to the program.

### Was There Discrimination Evidenced by Disparate Impact?

■ The disparate impact theory of discrimination has been applied where clearly identifiable employment requirements or criteria, regardless of whether there was intent to discriminate, resulted in a less favorable impact on a protected group. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (high school diplomas and aptitude tests); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (general ability tests); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (height and weight requirements). This court has followed such an approach in *Spurlock v. United Airlines*, 475 F.2d 216 (10th Cir. 1972) (college degree and 500 flight hours required for airline pilots), and *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (there was a company rule that truck drivers could not transfer to positions as "line" truck drivers, that is, "over-the-road" truck drivers). In cases such as this, statistical evidence is generally employed to prove the existence of disparate impact resulting from the criticized employment criteria.

Courts have also applied the disparate impact theory of analysis to cases where the

employer habitually engaged in a routine, general method of determining whether applicants or employees were qualified for particular jobs, promotions or transfers. Such general standards have been dealt with by this court in *Rich v. Martin Marietta Corp.*, 522 F.2d 333 (10th Cir. 1975), *Muller v. United States Steel Corp.*, 509 F.2d 923 (10th Cir. 1975); and *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972). Frequently these general policies involve subjective standards under the guise of which discrimination can more easily be practiced. *See*, for example, *Robinson v. Union Carbide Corp.*, 538 F.2d 652 (5th Cir. 1976).

Proof of a disparate impact gives rise to a prima facie case of employment discrimination upon a showing that the practices operate to exclude members of a protected group. *Griggs v. Duke Power Co., supra; Furnco Construction Corp. v. Waters, supra.* Statistical evidence will often be sufficient to establish the disparate impact. *Albemarle, supra.* The burden then shifts to the employer to show that its practice is "job related."

■ Plaintiff's allegations of discrimination generally do not fall within the categories of cases to which disparate impact analysis is applicable. There has not been an allegation that the company systematically followed a practice or procedure for hiring safety managers which is discriminatory in effect, nor does the evidence show that any such standard policy existed. In any event, discriminatory impact cannot be established where you have just one isolated decision. A claim of discrimination resulting from the mode of filling a single position does not give rise to a disparate *impact.* While Yellow Freight's general method of transferring employees to other shifts or of determining admittance to the management training program may, arguably at least, be a standard practice which may be analyzed under a disparate impact theory, it is clear that failure to appoint plaintiff to the position of safety manager does not fall within this category of cases.

*Did the Refusal of Yellow Freight to Grant the Plaintiff a Position Within the Company at Night So That He Could Go to Law School Constitute Disparate Impact?*

■ The difficulty with this contention is that there was no position available on the night shift for which plaintiff was qualified at the time in question. Where the disparate impact doctrine has been used by the courts in individual actions rather than class actions, a plaintiff has been required to show that he personally has been the victim of discrimination by the general practice which allegedly resulted in a discriminatory impact on a protected group. It is not sufficient for an individual plaintiff to show that the employer followed a discriminatory policy without also showing that plaintiff himself was injured. *See*, for example, *Muller v. United States, · supra*, 509 F.2d at 924. There we stated that "our primary inquiry is whether appellant company discriminated and whether appellee was shown to have been discriminated against." Also, in *Rich v. Martin-Marietta, supra*, 522 F.2d at 347–348, we agreed that the individual plaintiffs had to show that they were qualified for the positions that they sought; that this was necessary in order to establish a prima facie case of discriminatory impact. To hold otherwise would be to allow the plaintiff to avoid the fundamental requirements for constitutional standing in addition to failing to establish the fundamentals of disparate impact. Thus, in the last analysis, plaintiff must show that *he* had been denied an available position for which he was qualified. He would have no personal stake in the outcome of the case if he were unable to do this. *See Warth v. Seldin*, 422 U.S. 490, 498–9, 95 S.Ct. 2197, 2204–5, 45 L.Ed.2d 343 (1975). Since Coe was unable to point to a position which was available, a fundamental feature for proving disparate impact was absent. Plaintiff cannot go forward to show that the company's transfer policy had a discriminatory impact on a minority group as a whole.

*Does Yellow Freight's Refusal to Admit Plaintiff to Its Management Training Program Constitute a Possible Violation Under the Disparate Impact Theory of Employment Discrimination?*

■ Plaintiff's claim regarding the management training program appears to initially satisfy the requirements for analysis under a disparate impact approach in that defendant's policy with regard to this program conceivably could qualify as a program which was so narrow in scope as to suggest that it might have been a ploy by management to practice discrimination. The difficulty, however, is the lack of evidence to support such a theory. Coe did show that he had personal qualifications for the program. He had received his college degree and was generally qualified to be admitted to the program. Also, some two months after Coe left the company, a white man was admitted into the program. Plaintiff came very close to establishing that he himself was the victim of a general discriminatory policy, but it then became necessary for him to go forward with his case.

It is possible that the company's policy of admitting the applicants in the management training program served to confine minority employees to primarily non-managerial positions. Therefore, Coe was entitled to raise appropriate relevant statistical evidence to show that Yellow Freight admitted applicants to its management training program in a racial pattern significantly different from that of the pool of applicants to the program. *Albemarle, supra.* He failed, however, to introduce appropriate statistical evidence, and thus did not establish a prima facie case of discriminatory impact.

Plaintiff sought to introduce two sets of statistics into evidence. The first set sought to compare the number of minority employees in Yellow Freight's managerial work force in 1975 with the total number of minority workers in the national population. The second set of statistics sought to compare the number of minority employees in Yellow Freight's managerial work force in 1975 with the total number of minority persons in the Kansas City metropolitan area in 1970. The trial court refused to admit either set of statistics into evidence on the grounds that they were irrelevant to plaintiff's claim of discrimination. What plaintiff should have introduced were statistics showing the total number of black employees who had gone through the managerial school in relation to those who were qualified. If that number was zero or relatively small, it might have been significant considered in relation to the number of white persons admitted to the managerial training program. The total number of blacks in the United States does not prove anything. The statistics, however, would be significant if they showed that no, or few, black persons had ever been appointed to the managerial training program and that there were x number of black employees who had the qualifications to be admitted to the program. This would indicate that the policy was operated as it was in order to prevent black persons from pursuing management training. This would show that Yellow Freight admitted applicants to its program in a racial pattern significantly different from the pool of applicants to that program, or even from the pool of persons who could have applied to that program. Under the standards set forth in *Albemarle Paper Co. v. Moody, supra,* therefore, the proper statistics which were proffered by plaintiff were properly rejected by the trial court.

The courts have consistently required that the statistical evidence submitted to prove employment discrimination bear a direct relationship to the specific charge that is being tried. In *Hazlewood School District v. United States, supra,* the Supreme Court held that when determining whether a prima facie case had been established that the school district had discriminated against blacks in employing teachers, the proper statistical comparison was between the racial composition of Hazlewood's teaching staff and the racial composition of the qualified public school teacher population in the relevant market. 433 U.S. at 308, 97 S.Ct.

at 2742. In *Hazlewood* it was noted that in *Teamsters*, the following was said:

> The comparison between the percentage of negroes on the employers work force and the percentage in the general area white population was highly probative because the job skill there involved—the ability to drive a truck—is one that many persons possess or can fairly readily acquire. When special qualifications are required to fill jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the qualifications) may have little probative value * * *.

■ *See also Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). There the racial comparisons failed to take into account special qualifications for the position in question. In the case at bar, the proffered statistics failed to relate to the alleged charges of discrimination.[2] Further, the plaintiff's own evidence indicates that from 1974 to 1975 the total number of managerial employees of Yellow Freight decreased from 1,170 to 1,155, while during the same period the number of minority managerial employees increased from 48 (4.01%) to 66 (5.7%).

We are constrained to hold that the trial court did not err in refusing to admit the irrelevant statistics into evidence. We must also conclude that plaintiff did not prove a prima facie case of disparate impact.

# II.

## THE ISSUES WHICH HAVE TO DO WITH THE § 1981 JURY TRIAL

Several items are raised by the plaintiff, alleging errors that occurred in the § 1981 jury trial, as follows:

### A. *Note from the Jury.*

■ The jury rendered a verdict for the defendant, but submitted with its verdict a note written by the foreman which read as follows:

> Although we found cases of discrimination against the defendant, we found, by evidence submitted, none of these racial in connotation.

Coe has argued that this note was inconsistent with the general verdict and that it must, therefore, be set aside.

The court instructed the jury that it must find that any discrimination against Coe was racially motivated in order for it to reach a verdict in favor of the defendants. The jury found that no racial discrimination had been shown. They were individually polled as to whether they had found racial discrimination. Each juror replied that he did not. The fact that the jury may have felt that Coe was personally the object of discrimination due to personal dislike, for example, is irrelevant to a § 1981 action, which guarantees equal rights under the law, that is, rights equal to those exercised by white people. If, therefore, there was no *racial* discrimination shown, the fact that there was some kind of undefined discrimination does not fill the bill. So it

**2.** In cases where the employment practice objected to is not a specifically elucidated employment criteria, such as that found in *Griggs, supra,* and *Albemarle, supra,* but the practice objected to is merely a general policy of the employer, it is important that the statistics bear great relevance to the policy under attack. In cases where the policy complained of includes a specific screening mechanism, such as ability tests and aptitude tests, the employer can rebut the statistical evidence presented by the plaintiff by validating the test. But where the policy objected to is vague and general, once plaintiff shows discrimination by the use of statistics, the employer may only rebut the claim of discrimination by the use of statistics. Thus, the statistics used in cases not involving specific employment tests which serve as screening mechanisms for determining who should fill what job must be more closely scrutinized than the statistics used in cases where specific screening mechanisms are at issue. This is the approach followed by the Supreme Court when analyzing statistics in the general pattern and practice claims of discrimination, and this approach is equally applicable in disparate impact cases involving the same type of broad-based policies which are under attack. *See e. g., Hazlewood School District v. United States, supra; International Brotherhood of Teamsters, supra.*

cannot be said that the verdict should be set aside on this account.

### B. Contention of Plaintiff That He Was Constructively Fired.

Plaintiff alleged that the court erred in failing to instruct the jury as to the law relevant to a finding that he had been constructively discharged from his employment. The basis for this contention is plaintiff's further allegation that the company failed to promote him to the position of safety manager or to enroll him in its management training program, and that he was effectively "forced" to leave the company. The evidence shows, however, that Coe left the company in order to go to law school. He had taken the LSAT test three times before finally terminating his employment, in July of 1974, December, 1974, and February, 1975. He applied for admission to law school in December of 1974 and was accepted as a full time student for the semester which began in the fall of 1975, provided that he take a summer preparatory program commencing June 9, 1975. Coe testified that he was never asked to leave his position as a log clerk-safety assistant; that he could have kept that position; that no one was brought in to replace him until after he had informed the supervisor that he was going to law school. The sole reason that he claims to have been constructively discharged is that he could not move up in the company.

### C. What is a Constructive Discharge?

■ Constructive discharge involves the employer's deliberate effort to make things difficult for an employee in the course of his employment so as to force him to resign from his position. *Muller v. United States Steel Corp.*, 509 F.2d 923 (10th Cir. 1975), cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975). There was a dearth of evidence at trial tending to show that Yellow Freight deliberately engaged in a course of conduct designed to force plaintiff's working conditions to be so intolerable that he would be forced to quit. The only evidence offered at trial was to the effect

that Yellow Freight had refused to promote him or to transfer him to another position within the company. This does not show a deliberate effort on the part of Yellow Freight to force Coe to resign from his position of log clerk-safety assistant. Therefore, the trial court did not err in refusing to instruct the jury on a matter concerning which no evidence had been presented during the trial.

■ Plaintiff also contends that the court committed error in not receiving into evidence a decision of the Kansas Employment Security Division which allegedly stated that he did not voluntarily resign his job. Defendants maintain that the Division's records later indicated that Coe had quit his job to go to law school and that the decision was not admitted into evidence for that reason. We fail to see any indication that this was relevant evidence. Indeed, a thorough search of the record does not indicate that this document was ever offered into evidence or that reasons were given as to why it would be relevant.

We need not belabor the legal proposition that the appellate courts, including this one, will not consider rulings which are not part of the trial record, in the absence of extraordinary circumstances. *International Business Machines Corp. v. Edelstein*, 526 F.2d 37 (2nd Cir. 1975). Appellate courts will not speculate about the proceedings below, but will rely only on the record made. Meaningful review requires a record that elucidates the factors contributing to the judge's decision to deny the admissibility of the evidence. *See*, for example, *Andrews v. Olin Mathieson Chemical Corp.*, 334 F.2d 422 (8th Cir. 1964); *Evans v. Sheraton Park Hotel*, 503 F.2d 177 (D.C.Cir. 1974). In the absence of any statement on record, therefore, we decline to consider this ruling.

### D. Plaintiff's Other Contentions.

We have examined the plaintiff's contention that the court should have given the jury a limiting instruction pertaining to the announcement of the decision in *University of California Regents v. Bakke*, 438 U.S.

265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Coe requested such an instruction, but the court declined to follow that request, and in our . judgment the judge was correct. Bakke bears no relevance to the instant controversy.

Finally, plaintiff alleged that the trial court erred in permitting Ken Thompson to testify since his name had not been furnished on the list of witnesses. The trial court held that Thompson's name was inadvertently left off the list, and it was in the court's discretion to so rule. Thompson was a necessary witness because he alone knew all of the facts surrounding the main contention of the plaintiff, namely that Thompson had deprived plaintiff of the safety manager's position. Thompson was a vital witness, and Coe was fully aware of this fact.

We conclude, therefore, that the plaintiff has failed to demonstrate prejudicial or reversal error.

Accordingly, the judgment of the district court is affirmed.