**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 2 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

WILLIE E. SANDOVAL,

    Plaintiff - Appellant,

v.

THE CITY OF BOULDER,
COLORADO,

    Defendant-Appellee.

No. 02-1226

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 99-M-2293)

---

John W. McKendree (Elizabeth Kelly with him on the briefs), Law Offices of
John W. McKendree, Denver, Colorado, for Plaintiff-Appellant.

Jonathan W. Rauchway (Andrew M. Low and Janet A. Savage with him on the
brief), Davis Graham & Stubbs LLP, Denver, Colorado, for Defendant-Appellee.

---

Before **EBEL**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **MURPHY**,
Circuit Judge.

---

**EBEL**, Circuit Judge.

---

    Plaintiff-Appellant Willie E. Sandoval, a Hispanic woman of Mexican

descent, brought this current action alleging workplace discrimination on the

basis of sex, race, and national origin against the City of Boulder, Colorado, Boulder County, the Boulder Regional Communications Center, and various top officials of the law enforcement and fire safety agencies in the Boulder region. Sandoval was a long-time employee of the Boulder Police Department, where she worked in the Boulder Regional Communications Center ("BRCC") run jointly by the City and County of Boulder, which handled 9-1-1 emergency calls. She was eventually appointed to lead the BRCC, but after the BRCC was reorganized as a joint operation that included several additional regional law enforcement and fire departments, her expectation that she would be appointed by the new Executive Committee overseeing the BRCC to the position of Executive Director was not fulfilled. Sandoval's working relationships with the members of the BRCC Executive Committee and other BRCC staff worsened over time, and she ultimately filed suit in the District of Colorado, seeking relief under 42 U.S.C. §§ 1981, 1983, 1985(3), 1986, and 2000e, *et seq.* (Title VII of the Civil Rights Act of 1964), 29 U.S.C. § 206(d) (the Equal Pay Act), and the Colorado Anti-Discrimination Act, as well as raising a variety of state claims.

The district court granted summary judgment in favor of all defendants on all of Sandoval's claims, after which Sandoval settled her claims with all defendants save the City of Boulder. She now appeals the district court's entry of summary judgment as to the City. Because Sandoval has not pointed to any

- 2 -

genuine issues of material fact that might show she suffered unlawful discrimination attributable to the City of Boulder, we AFFIRM.

## I.    Background

The City of Boulder ("City") first hired Willie Sandoval as a police department dispatcher in 1981 and assigned her to the BRCC, which handled 9-1-1 and dispatch services for the City, the Boulder County Sheriff, and other public safety agencies in Boulder County. At that time, the BRCC was operated jointly by the City's Police Department and the County Sheriff's Office, but Sandoval remained a City employee throughout her tenure at the BRCC. In 1991, Sandoval was promoted to the position of supervisor at the BRCC.

In early 1995, the City and the County agreed with several of the smaller municipalities in Boulder County to use an Intergovernmental Agreement ("IGA") pursuant to Section 29-1-203 of the Colorado Revised Statutes in order to create a new entity to run the BRCC. In July of that same year, before the new IGA went into effect, the incumbent Director of the BRCC resigned. Boulder City Police Chief Tom Koby and Boulder County Sheriff George Epp, who still had control over BRCC personnel issues pending the conclusion of the new IGA, decided to appoint Sandoval as the Director of the BRCC. Koby and Epp's decision to appoint Sandoval met resistance, however, from the police chiefs for the cities of

Louisville and Lafayette, who were concerned that Sandoval lacked the technical skills and knowledge of the budget process necessary to be successful in the position of Director. While the Louisville and Lafayette police chiefs did not at that point have any official veto power over Koby's and Epp's decisions, the dissenters were slated to be on the newly-established Executive Committee (EC) that would govern the BRCC and have the power to appoint the BRCC's Executive Director once the IGA went into effect. Koby and Epp agreed with the future EC members that they would appoint a former BRCC director, Bill McCaa, as "Acting Director" of the BRCC. McCaa's task was to mentor Sandoval in the administrative and technical matters with which she was less familiar. There was a dispute below about what Sandoval's position was at this time, with some evidence indicating she was titled as the "Assistant Director," while Sandoval insisted she retained the position of "Director." On appeal, the City assumes for the sake of argument that Sandoval's title from July 1995 was "Director."

In March of 1996, the new IGA went into effect, and the BRCC came under the control of the seven-member Executive Committee which was staffed by the heads of the various public safety agencies that were the signatories to the IGA. The arrangement placing McCaa as Sandoval's mentor continued for another 14 months after the IGA entered into force.

The IGA specified that the Executive Committee would hire and supervise the Executive Director of the BRCC.[1]  All other staff working at the BRCC remained employees of their respective municipal agencies but were effectively "seconded" or assigned to the BRCC through those agencies' contract with the BRCC.  Although the BRCC technically only ever had one employee—the Executive Director, hired on an "at will" basis by the EC and paid a salary drawn from BRCC funds—the EC was also given the authority to terminate lower-ranking BRCC staff members' assignments to the Center and to send such assigned staff members back to their home agencies.  Since all such staff members were officially employed and paid by their respective home agencies, however, the EC's control over the staff members' tenure with the BRCC did not translate into the power to actually hire or fire anyone other than the BRCC Executive Director.

In the year following the IGA's entry into force, Sandoval claims that she was assured multiple times by Boulder City Police Chief Koby and by McCaa that she would assume the position of BRCC Executive Director once McCaa's mentoring assignment was completed.  However, when faced with McCaa's

---

[1]We use the term "Executive Director" for the position to be filled by the EC after the BRCC was reorganized in 1996 for purposes of clarity in this opinion although the parties and the underlying documents sometimes refer to this position by different names.

impending retirement, the BRCC Executive Committee decided in May of 1997, over Chief Koby's objections, to conduct a nation-wide search for a new Director.

The search for the new BRCC Executive Director proceeded in four stages. Of the 176 applications received, 68 met the minimum qualifications. Those applications were then reviewed by four of the EC members and scored according to nine experience-related criteria, resulting in a surviving applicant pool of 21 people. After a round of phone interviews, the field was narrowed yet again to eight candidates, one of whom was Sandoval. After two applicants withdrew, the remaining six candidates were then interviewed in person both by the EC members and by a second *ad hoc* panel of the "users" of the BRCC's services who possessed special technical and operational expertise. Sandoval alleges that she likely did not get a fair appraisal from one of the EC members because he had previously expressed reluctance to hire a woman to serve as BRCC Director. She also alleges that two members of the EC made insensitive and apparently sexist remarks during her interview. At the same time, Sandoval concedes that she performed poorly in both interviews, and the interviewers' score sheets comparing the candidates indicate that Sandoval was consistently ranked fourth or fifth by the EC members and third or fourth by the members of the "users" panel.

In spite of Koby's advocacy on her behalf, Sandoval was not among the three finalists considered by the Executive Committee, and she was not selected

to be the new Executive Director of the BRCC. The position was instead given to Mike Brown, a white male, who began his tenure in March of 1998. Sandoval was made the Assistant Director. Seven months later, Brown resigned his position under a cloud after the Executive Committee began an investigation into allegations of financial irregularities at the BRCC. After Brown's resignation, and in response to complaints from BRCC staff about Sandoval's management practices, the EC extended its investigation with a revised focus on Sandoval. On October 28, 1998, Sandoval was reassigned by the Executive Committee to work on special projects for the BRCC pending the completion of the investigation, and her office was moved offsite to the Boulder County Criminal Justice Center. The investigators' final report claimed they found "credible evidence" that Sandoval had engaged in intimidating behavior toward some BRCC staffers and showed favoritism toward others; that she had become "extremely intoxicated" at a BRCC staff retreat, called then-Director Mike Brown "the enemy," and made sexual advances toward her colleagues; and that she had known of Mike Brown's financial misconduct but had failed to take any action.

In October 1999, the Boulder City Counsel voted to withdraw from the BRCC, effective January 2000. On October 21, 1999 Boulder's new Police Chief Mark Beckner met with Sandoval to discuss her future employment after the dissolution of the BRCC and offered her a supervisory position at the new

communications center operated by the Boulder City Police Department. The proposed position was the highest-ranked slot open to a civilian, and Sandoval's pay was to have equaled her salary at the BRCC. After Beckner subsequently gave her a mixed evaluation of her performance at the BRCC, however, Sandoval notified Beckner in a letter dated November 26, 1999 that she considered herself constructively discharged because the new job offer was unacceptable. The same day, Sandoval filed this employment discrimination suit against the BRCC, the City, and the individual members of the BRCC Executive Committee.[2]

After the District Court granted summary judgment for all defendants on all twenty of Sandoval's counts, all defendants except for the City of Boulder settled the litigation. Sandoval now appeals from summary judgment on six of her claims against the City.

## II.    Discussion

### A.    Jurisdiction and Standard of Review

The district court had federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. We have jurisdiction on appeal pursuant to 28 U.S.C. § 1291.

---

[2]Former Boulder Police Chief Tom Koby, who had been Sandoval's strongest advocate, was initially listed as a defendant but was never served.

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Summary judgment is appropriate if . . . there is no genuine issue as to any material fact and [if] the moving party is entitled to judgment as a matter of law. When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999) (quoting Byers v. City of Albuquerque, 150 F.3d 1271, 1274 (10th Cir. 1998); Fed. R. Civ. P. 56(c)) (internal citations and quotation marks omitted). This court is not, however, obligated to comb through the summary judgment record and make a party's case for it by locating materials not referenced by that party. Adler v. Wal-Mart Stores, Inc. 144 F.3d 664, 672 (10th Cir. 1998).

B.    Disparate Treatment

Sandoval appeals from the district court's entry of summary judgment for the City on two claims of disparate treatment under Title VII: first, that she was not offered the position of BRCC Executive Director as a result of discrimination on the basis of her sex, race, and national origin; and second, that the City's discriminatory conduct toward her ultimately amounted to constructive discharge. Because Sandoval has not pointed to evidence that could show that she suffered

any unfavorable treatment or adverse employment action attributable to the City, we AFFIRM.

### *1.    Failure to hire as BRCC Executive Director*

We begin by noting an important distinction between Sandoval's position as "Director," to which she claims she was appointed in July 1995 with McCaa as her mentor, and the position of BRCC Executive Director for which the EC initiated a nationwide search starting in May 1997. Prior to the reorganization of the BRCC in 1996, the BRCC Director answered to the Boulder County Sheriff and to the Boulder City Chief of Police. After the new IGA entered into force in March 1996, the position of BRCC Executive Director was under the sole control of the Executive Committee—the Executive Director was to serve at the pleasure of the EC and was the EC's only employee. As Sandoval notes, the City paid her salary at all times relevant to the dispute, and she remained a City employee throughout this time. Sandoval may well have held the title of BRCC Director in May 1995, but she does not dispute that she was never hired by the EC to serve as Executive Director of the post-IGA, reorganized BRCC. In fact, the EC's failure to hire her for that position is the main focus of her disparate treatment claim.

To survive summary judgment, a plaintiff bringing a Title VII failure to hire claim must first establish the four elements of a *prima facie* case of discrimination by showing that:

> (i) plaintiff belongs to a protected class; (ii) plaintiff applied and was qualified for a job for which the employer was seeking applicants; (iii) despite being qualified, the plaintiff was rejected; and (iv) after plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications.

Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)) (internal quotation marks omitted). Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate legitimate, nondiscriminatory reasons for the contested action. Kendrick, 220 F.3d at 1229-30. "[I]f a plaintiff presents evidence that the defendant's proffered reason for the employment decision was pretextual–i.e. unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial." Id. at 1230.

To avoid summary judgment on her claims against the City, however, Sandoval must also show that the City was responsible for the discrimination she claims to have suffered. Because she has not shown that the City was either directly or vicariously responsible for the BRCC's allegedly discriminatory failure to hire her, we conclude that the district court's entry of summary judgment on Sandoval's failure to hire claim was appropriate.

- 11 -

a.    Direct liability

Although Sandoval argues that the City is directly liable for the alleged discrimination of the BRCC Executive Committee, she fails to identify any discriminatory actions taken by Police Chief Koby or Fire Chief Larry Donner, the City's two representatives on the EC.  Nor does Sandoval allege that these two City representatives were able to control the hiring decisions of the seven-member Executive Committee.  In his deposition testimony below, Koby stated that he thought the EC had discriminated against Sandoval on the basis of her gender, her race, and her national origin, and included himself as a culpable participant in that discrimination.  But Koby appears not to have acted on whatever discriminatory feelings he might have had.  To the contrary, Koby was Sandoval's consistent advocate on the EC, first urging the EC to forego a national search and simply appoint Sandoval as the Executive Director of the new BRCC, and then arguing during the interview process that Sandoval should be selected for the top position.  Whatever the strength of Sandoval's discrimination charge against the BRCC, she cannot hold the City directly liable for the BRCC's failure to hire her in the absence of any evidence that the City contributed to the alleged discrimination.

b.    Vicarious liability

Sandoval also claims that the City should be held vicariously liable for the BRCC Executive Committee's allegedly discriminatory refusal to hire her as Executive Director, arguing that the City and the BRCC were her joint employers or, in the alternative, that the two entities constituted a single employer for purposes of Title VII liability.

i.    *Single employer analysis*

We weigh four factors in considering whether two nominally separate entities constitute an "integrated enterprise" or a single employer: (1) interrelations of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control.  Bristol v. Bd. of County Comm'rs of the County of Clear Creek, 312 F.3d 1213, 1220 (10th Cir. 2002) (*en banc*).  For purposes of finding shared liability, we "generally consider the third factor—centralized control of labor relations—to be the most important." Id.  See also 1 Arthur Larson & Lex K. Larson, Employment Discrimination § 5.03[1][a], at 5-22 (2d ed. 2003) ("[T]o determine whether both entities are properly before the court, the four-part [] test has been recited by the courts.  But an examination of the decisions nevertheless shows that the courts rely primarily

on one factor when determining whether an entity is liable under Title VII: the extent of control an entity has over employment decisionmaking.")

The post-IGA BRCC and the City of Boulder do not satisfy our single employer standard. Sandoval has pointed to no evidence in the record showing that the BRCC and the City had sufficiently interrelated operations. The City Police Department's secondment of its employees to the BRCC, like its receipt of emergency communications services from the BRCC, merely identified the City as one of the member-municipalities of the BRCC. See Frank v. U.S. West, Inc., 3 F.3d 1357, 1362-63 (10th Cir 1993) (listing common indications of interrelated operations, including joint bookkeeping and payroll, shared office space and equipment, common employees, or common advertising). Nor did the BRCC and the City have common management, since the heads of the City Fire and Police Departments only occupied two out of the seven seats on the BRCC's Executive Committee, and the EC had no influence over the general operations of the Boulder City Police or Fire Departments. Cf. id. at 1364 (listing circumstances of common management as those including identical or heavily overlapping officer ranks or boards of directors, and common presidents).

Most importantly, the BRCC and the City Police did not share centralized control of labor relations. Under the 1996 IGA, all BRCC staff other than the Executive Director remained employees of their respective municipal agencies but

- 14 -

were effectively seconded to the BRCC through the localities' contract with the BRCC. The BRCC Executive Committee had oversight over work and discipline issues within the BRCC, and the EC had authority to terminate any staff member's assignment to the BRCC. The EC did not, however, have any influence over any staff member's continued employment with his or her home agency. As was pointed out above, the Executive Director of the BRCC was an "at will" employee of the EC, and the City's influence on the hiring and firing of the Executive Director was limited to its two votes on the seven-member Executive Committee.

In Swallows v. Barnes & Noble Book Stores, Inc., the Sixth Circuit found, in similar circumstances, that a university and the bookseller with whom it had contracted to run its bookstore could not be considered a single employer for purposes of the ADA and the ADEA. 128 F.3d 990, 995-96 (6th Cir. 1997). The university had retained control over which employees of the private bookseller could be assigned to staff the university bookstore, but the school had no control over the bookseller's hiring or firing decisions. Id. at 995.

We have previously observed that the right to terminate employment is the most important aspect of the "control over the terms and conditions of an employment relationship" that we require in this context, Bristol, 312 F.3d at 1219, and we therefore conclude, as did the Sixth Circuit, that while an

- 15 -

organization's ability to control which employees of a contract partner are assigned to work for that organization may give it "a voice in certain employment decisions" made by the contract partner, it does not grant the kind of control over the partner's employment decisions that would justify treating the two entities as a single employer. See Swallows, 128 F.3d at 995.[3] We conclude, therefore, that Sandoval cannot hold the City liable for any discrimination on the part of the BRCC Executive Committee under a single employer theory.

*ii.    Joint employer analysis*

Sandoval claims, in the alternative, that the City and the BRCC Executive Committee were "joint employers," and that the City can be held vicariously liable for the discrimination of which she accuses the BRCC. As we explained in Bristol, "the single-employer test asks whether two nominally separate entities

---

[3]We note that other courts have been particularly cautious in finding that two nominally separate state or municipal governmental entities are in fact a single employer, since such a conclusion effectively negates what we assume was a state's conscious choice to create distinct organizations. Absent some indication that the state's decision was motivated by a desire to circumvent the civil rights laws or other laws, principles of comity counsel federal courts not to be too quick to erase organizational dividing lines drawn up by state authorities. Cf. Lyes v. City of Riviera Beach, 166 F.3d 1332, 1343-44 (11th Cir.1999) adopting a presumption against "single-ness" when counting heads for Title VII jurisdiction for the same comity reasons); see also Shauna Cully Wagner, Annotation, Propriety of Treating Separate Entities as One for Determining Number of Employees Required by Title VII, 160 A.L.R. Fed. 441 at § 12 (2004).

should in fact be treated as an integrated enterprise, while the joint-employer test assumes that the alleged employers are separate entities." 312 F.3d at 1218. We treat independent entities as joint employers "if the entities share or co-determine those matters governing the essential terms and conditions of employment. In other words, courts look to whether both entities exercise significant control over the same employees." Id. (internal quotation marks omitted); see also Swallows 128 F.3d at 993 n.4 ("The basis of the [joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.") (quoted in Larson, *supra*, § 5.03[1][c], at 5- 24). "Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances." Bristol, 312 F.3d at 1219.

While the single employer test looks at the overall relationships of the two entities, joint employer status is determined by focusing on the entities' relationships to a given employee or class of employees. The joint employment relationship, in other words, is employee-specific. See Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1330 (10th Cir. 2002) ("When a worker is formally employed by one organization, but important aspects of his work are subject to control by another organization, both organizations are employers of

- 17 -

the worker. . . . Thus two entities may both be a worker's employer if they share or co-determine those matters governing the essential terms and conditions of employment." (internal quotation marks omitted)).

Sandoval claims that she was discriminated against when the BRCC Executive Committee failed to hire her as its Executive Director. For the City to be even potentially liable for that failure to hire, however, Sandoval must be able to show not merely that the City and the EC might have been joint employers of the other BRCC staff, but that the City and the EC were joint employers of the position for which Sandoval applied—that of BRCC Executive Director. This she cannot do.

Under the terms of the IGA, the Executive Director was hired by the EC, paid out of the BRCC budget, and served at the pleasure of the EC. The City's only control over the terms and conditions of the Executive Director's employment was through its representation on the EC, where two out of seven seats were occupied by City officials. Those two seats on the EC did not give the City control over the hiring decisions of the EC, as Koby's unsuccessful efforts to persuade his colleagues to appoint Sandoval as Executive Director amply demonstrate, and there is nothing in the record to indicate that the City or its representatives on the EC could have forced the removal of whomever was hired as Executive Director. Sandoval has not pointed to any disputed material fact that

could show the City shared or co-determined the essential terms and conditions of the Executive Director's employment.  Thus, we conclude that the City and the EC were not joint employers for purposes of Sandoval's failure to hire claim. Since the City can be held neither directly nor indirectly liable for the allegedly discriminatory hiring decision of which Sandoval accuses the BRCC,[4] we AFFIRM the district court's entry of summary judgment.[5, 6]

## 2.	Constructive Discharge

[4]Because we find no joint employer relationship we need not reach the question of what the scope of one joint employer's vicarious liability would be for actions of its partner in which it did not participate or over which it had limited or no control.

[5]Sandoval also argues that the City is liable for the BRCC's actions as its "successor employer."  The district court correctly found that the BRCC had no Title VII liability to which the City could succeed, since the BRCC itself had only one employee—the Executive Director—and was therefore not covered by Title VII.  Sandoval does not challenge this ruling on appeal.  She argues instead that the 15-employee minimum of Title VII does not apply to § 1981 claims.  That this is indeed true is of no help to Sandoval, since she has also failed to appeal the district court's summary judgment on her § 1981 claims.  Her appellate briefs mention § 1981 only in the context of her disparate impact claims, but § 1981 requires purposeful discrimination and therefore does not apply to disparate impact claims, such as Sandoval's.  Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir. 2000); see also Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265-68 (1977) (setting out the test for finding discriminatory purpose underlying facially neutral actions that have discriminatory impact).

[6]Additionally, we agree with the District Court that Sandoval does not raise a generic dispute of pretext as to BRCC's stated reasons for not hiring her as Executive Director.

- 19 -

Sandoval's second disparate treatment claim rests on allegations that she was constructively discharged by the City. Sandoval cannot survive summary judgment unless she makes a *prima facie* showing of unlawful discrimination, but as the Supreme Court recognized in McDonnell Douglas, the elements required for such a showing are somewhat flexible depending on the facts of the case. 411 U.S. at 802 n.13 (1973); see also Kendrick, 220 F.3d at 1227 n.6. Here, she can make the necessary showing by establishing: 1) that she is a member of the class protected by the statute; 2) that she was qualified for her job; 3) that despite her qualifications, she was discharged; and 4) the job was not eliminated after her discharge. Kendrick, 220 F.3d at 1229. Sandoval has not pointed to any record evidence that would be sufficient for a jury to find she was constructively discharged by the City, and thus at a minimum she cannot establish the third prong. Since Sandoval has not satisfied the requirements for a *prima facie* case of discrimination, we affirm the district court's entry of summary judgment on this count.

We apply an objective standard to determine whether constructive discharge has occurred:

> Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. Essentially, a plaintiff must show that she had *no other choice* but to quit. The conditions of employment must be objectively

intolerable; the plaintiff's subjective views of the situation are irrelevant.

Sanchez v. Denver Public Schools, 164 F.3d 527, 534 (10th Cir. 1998) (internal citations and quotations omitted).

The bulk of the hardships alleged by Sandoval were the result of the investigation into her management practices after the resignation of Mike Brown. That investigation was commissioned by the BRCC, not by the City. The decision to reassign Sandoval to special project work and move her out of the BRCC offices was similarly made by the EC on behalf of the BRCC, not by the City. As we noted above, the EC had the authority, independent of the member agencies, to terminate or modify the assignments of BRCC staff, and Sandoval has pointed to no evidence that City officials could have prevented her reassignment by the EC. Her complaints about the conduct and outcome of the EC's investigation thus do not implicate the City.

Further, Sandoval also fails to explain how her humiliation resulting from the EC's investigation contributed to her alleged constructive discharge nearly a year later by the City when she claims she was forced to refuse the new position offered to her in the City Police Department's new communications section.

Sandoval also argues that her working conditions after her reassignment, and the nature of the new position she was offered by the City after the dissolution of the BRCC, were objectively intolerable and forced her to resign.

While Sandoval states that she was assigned after her transfer to a smaller office than she had at the BRCC, she concedes that she received permission to work from home and thus was not forced to work in an office she disliked. The position offered to Sandoval with the City Police was the highest civilian post available in the new communications and dispatch section. Her salary would have been unchanged from what she received with the BRCC, and while she was ineligible for merit pay raises, this was the result of her having reached the top of her pay grade, which itself was two levels above all other supervisors in the new dispatch section.

We conclude that this evidence produced by Sandoval could not lead a rational juror to conclude that a reasonable person would have felt compelled to resign, and we therefore AFFIRM the district court's entry of summary judgment on her constructive discharge claim.

C.    Disparate Impact

Sandoval also asserts that, even if the City's hiring practices are facially neutral, they have a disparate impact on minorities and women. Specifically, she complains about the process the Executive Committee used in 1997 to choose Mr. Brown as the BRCC's Director. Of course, in this first instance, this claim fails because it was the BRCC that hired Brown, not the City.

In addition, we have previously held that "[a] claim of discrimination resulting from the mode of filling a single position does not give rise to a disparate impact." Coe v. Yellow Freight Sys., Inc., 646 F.2d 444, 451 (10th Cir. 1981). We also generally require statistical evidence to show that a challenged employment practice has a discriminatory impact on members of a protected class. Id. at 452.

Sandoval provides no meaningful support for her claim, and our review of the record revealed no data on the number of women or minorities who applied for supervisory or management level jobs recently filled by the City, nor could we find any evidence that such applicants faced a higher rejection rate than male or Caucasian applicants. Notwithstanding Sandoval's insistence to the contrary, Chief Koby's conclusory observation that few public safety agencies in Boulder County employ minorities and women in their upper ranks does not constitute "statistical evidence" that the City's challenged hiring practices systematically disadvantaged minorities and women. We therefore affirm the district court's entry of summary judgment on Sandoval's disparate impact claim.[7]

_____

[7]At the close of her Disparate Impact argument, Sandoval claims that she has demonstrated she was the victim of discrimination redressable under 42 U.S.C. §§ 1981, 1983 and under Colorado's state anti-discrimination act, Colo. Rev. Stat. § 24-34-401. Section 1981 requires purposeful discrimination, however, and so does not apply to disparate impact claims that do not raise a presumption of such a discriminatory purpose. Drake v. City of Fort Collins, 927

(continued...)

D.    Hostile Work Environment

Sandoval's claims of a hostile work environment are also inadequate.  To survive summary judgment, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998).  Sandoval must also produce evidence from which a rational jury could infer that she was targeted for harassment because of her gender, race, or national origin.  See Penry v. Fed. Home Loan Bank, 155 F.3d 1257, 1261 (10th Cir. 1998).

---

[7](...continued)
F.2d 1156, 1162 (10th Cir. 1991).  Sandoval argues that the overly subjective criteria used to evaluate applicants for the BRCC Executive Director post allowed racial and gender bias to affect the EC's decision, but she does not claim that the allegedly abstract criteria were adopted *for the purpose* of camouflaging racial or gender bias under a cover of feigned objectivity.  Nor does she point to any of the factors from which the Supreme Court has said courts might infer discriminatory purpose lurking behind a mask of facial neutrality.  See Village of Arlington Heights v. Metropolitan Housing Dev., 429 U.S. 252, 265-68 (1977) (listing "historical background of the decision" in question, the "specific sequence of events leading up to the challenged decision," and legislative or administrative histories as items to examine in sniffing out hidden prejudice).  The district court's dismissal of Sandoval's §§ 1981 and 1983 counts was therefore also correct.  To the extent that Colorado's anti-discrimination statute permits discriminatory impact claims, the state courts appear to have adopted the federal standard applied under Title VII, Boghadi v. Dept. of Natural Resources, 995 P.2d 288, 296 (Colo. 2000), and, based on our analysis of the merits of Sandoval's Title VII disparate impact claim, we affirm the district court's entry of summary judgment as to that state law count as well.

The only example of intimidation, ridicule, or insult mentioned by Sandoval occurred when she was the target of apparently sexist remarks during the process of selecting a new BRCC Director, and the comments came from members of the BRCC Executive Committee who were not representatives of the City. The two comments mentioned by Sandoval could not by themselves support a factual finding that her working environment was "permeated" with sexist abuse. Nor has Sandoval produced any evidence that any of the other actions she views as having disadvantaged her professionally were motivated by bias against her on the grounds of sex, race, or national origin or that they arose even close to the level required for a hostile work environment claim. The district court properly granted summary judgment for the City on this claim as well.

E.    Equal Pay Act

To establish a *prima facie* case under the Equal Pay Act, 29 U.S.C. § 206(d)(1), ("EPA") a plaintiff must show that: (1) she was performing work that was substantially equal to that of male coworkers, with "equality" being measured on the basis of the skills, duties, supervision, effort, and responsibilities of the jobs; (2) the conditions where the work was performed were essentially the same; and (3) the male employees were paid more. Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1364 (10th Cir. 1997). "We do not construe the 'equal work'

- 25 -

requirement of the EPA broadly, and we have stated that failure to furnish equal pay for 'comparable work' or 'like jobs' is not actionable. Rather, in order to prevail in such an EPA action, the jobs must be substantially equal in terms of skill, effort, responsibility, and working conditions." Id. (citations omitted) (internal quotations omitted).

Sandoval first compares her income to that of McCaa, who was a Captain in the Boulder County Sheriff's Department and was paid by the Sheriff's Department, while Sandoval was employed and paid by the City Police Department. McCaa had prior experience running the BRCC, and during the time he was assigned to be her "mentor"—an inherently supervisory assignment, in the course of which he formally evaluated Sandoval's performance as her superior —he also continued to serve the Sheriff's Department as the officer in charge of the "technical systems division." McCaa and Sandoval were not employed by the same organization, and they did not perform equal work. Sandoval's comparison to McCaa is therefore unavailing.

Sandoval's second comparator, Mike Brown, was the BRCC Executive Director—and thus the only person direct employed and paid by the BRCC—while Sandoval never held that position. As she concedes in her briefs on appeal, Sandoval remained an employee of the City at all relevant times.

Sandoval's comparison to Brown also fails to establish a *prima facie* case under the Act.

Finally, Sandoval also agues on appeal that her salary should be compared to that of an unidentified "*experienced* white male." Assuming the City is correct in surmising that Sandoval is referring to Robert Sullenberger, a Commander in the Boulder City Police Department, who was appointed as director of the City-operated communications center after the dissolution of the BRCC in 2000, we note that Sandoval presented no Equal Pay Act argument based on Sullenberger's salary before the district court and therefore decline to consider it on appeal. See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1311 (10th Cir. 1999) (declining to consider a discrimination theory predicated on statistical evidence not brought before the district court). Further, Sandoval fails to put on any evidence that her job was substantially equal to Sullenberger's job.

Because Sandoval has not satisfied the requirements for a *prima facie* case under the Equal Pay Act, we affirm the district court's entry of summary judgment for the City on that claim.

F.      Section 1983—Lack of Hearings

Sandoval also appeals the district court's rejection of her efforts to hold the City liable under 42 U.S.C. § 1983 for failing to grant her pre-termination and name-clearing hearings.

Sandoval first characterizes the EC's decision not to hire her as BRCC Executive Director as a "termination" of her claimed prior position of "Director" of the BRCC and complains that she was not given a termination hearing addressing her removal from that position. Sandoval, however, was never employed as Executive Director of the post-IGA BRCC, and thus she was not "terminated" from that position when the EC decided to hire Mike Brown. Additionally, the actions she complains of were actions by the BRCC and not actions of the City. As discussed earlier, the City is not responsible for the actions taken by the BRCC in hiring its Executive Director.

In addition, Sandoval's only request for a hearing of any kind came nearly two years after she now seems to claim she was terminated or demoted, and after she had initiated this litigation. The purpose of the requested hearing, moreover, was to allow Sandoval to challenge the negative performance evaluation she claims contributed to the loss of her good name and reputation, not to contest the decision by the EC not to appoint her as BRCC Executive Director. Sandoval has waived any argument that she was denied due process by failing to request the

hearing to which she now claims she was entitled. See Pitts. v. Bd. of Educ., 869 F.2d 555, 557 (10th Cir. 1989).

Sandoval also argues that she was entitled to a name-clearing hearing to respond to the results of the BRCC's investigation into her management of the BRCC. Before she can establish such an entitlement, however, Sandoval must show that the City infringed her liberty interest in her good name and reputation as it affects her protected property interest in continued employment.

> First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. And fourth, the statements must be published. These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest.

Workman v. Jordan, 32 F.3d 475, 481 (10th Cir. 1994) (citations omitted).

Sandoval claims that the conclusions of the investigation into alleged irregularities during her tenure at the BRCC falsely impugned her reputation and has prevented her from obtaining subsequent employment. She has not, however, raised a genuine issue of material fact as to at least the first and third Workman factors.

These alleged derogatory statements were not made by the City. Further, the derogatory statements of which she complains were not made in the course of terminating her employment, since she resigned on her own accord. In Stidham v.

- 29 -

<u>Peace Officer Standards and Training</u>, this court recognized the narrow interpretation of "foreclosing other employment opportunities" adopted by the Supreme Court in <u>Siegert v. Gilley</u>, 500 U.S. 226 (1991), and held that the plaintiff had not alleged the deprivation of a protected liberty interest even where the defamatory statements had injured his reputation and thereby harmed his ability to obtain new employment. 265 F.3d 1144, 1154 (10th Cir. 2001). Sandoval states that she has applied for, and been rejected from, approximately 100 positions for which she is qualified. <u>Workman</u> and <u>Siegert</u> require, however, that other employment opportunities must be "foreclosed"—not merely made difficult to obtain because of damage done to the plaintiff's reputation—if the derogatory statements were not made in the context of the defendant terminating her employment, and she does not claim that the negative information that emerged from the BRCC investigation has made her categorically ineligible for other employment in either the public or the private sector.

Since Sandoval has not pointed to a genuine dispute over material facts as to her claims that she was deprived by the City of her liberty and property interests in her reputation and future employment, she has not shown that she

might have been entitled to a name-clearing hearing.[8] Thus the district court properly entered summary judgment on her § 1983 claim.

G.      Breach of Contract and Promissory Estoppel

Sandoval's final claim on appeal challenges the district court's entry of summary judgment on her charge that the City breached an oral contract created by Police Chief Koby's assurances to Sandoval that she would get the job of BRCC Executive Director, and on her promissory estoppel claim that she relied on Koby's promises to her detriment. Sandoval has not shown that Police Chief Koby had the power or authority to bind the City or the BRCC Executive Committee with his promises to Sandoval that she would be given the position of BRCC Executive Director after McCaa's departure. Without that power, Koby's promises could not create a binding oral contract. Holland v. Bd. of County Comm'rs, 883 P.2d 500, 506 (Colo. Ct. App. 1994).

Sandoval's promissory estoppel claim also fails to satisfy the requirement of Colorado law that the plaintiff show:

> (1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that promise would induce action or

_____

[8]Additionally, Sandoval has failed to present any evidence that the City maintained a custom or practice of violating their employees' liberty interests in their good names or that Koby or other identified City officials were "final policymakers" with regard to the BRCC actions of which she complains.

forbearance by the promisee; (3) the promisee in fact reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice.

Berg v. State Bd. of Agric., 919 P.2d 254, 259 (Colo. 1996).

Even assuming reliance on Koby's promises could be considered reasonable, Sandoval has not presented any evidence that she in fact actually relied on Koby's promises to her detriment. She argues that she "allowed" her title to be changed and she tolerated being placed under McCaa's mentorship in the expectation that she would eventually rise to the top job. But Sandoval points to nothing in the record to show that these were decisions over which she in fact had any control and which could therefore support her argument that she acquiesced to these changes in reliance on Koby's promises. Nor does she allege that she passed up other available employment alternatives in reliance on Koby's assurances. The district court properly entered summary judgment for the City on these claims.[9]

## III.   Conclusion

We AFFIRM the district court's entry of summary judgment for the City on all counts.

---

[9]To the extent that Sandoval raises other claims, and it is not always easy to discern precisely the nature of all of her claims, we find no merit in them.