**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 11, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

DEBORAH STEELE,

        Plaintiff-Appellant,

v.

KROENKE SPORTS ENTERPRISES,
L.L.C.,

        Defendant-Appellee.

---

PAUL ANDREWS, in his individual
and official capacities; DOUG
ACKERMAN, in his individual and
official capacities,

        Defendants.

No. 06-1377
(D.C. No. 05-cv-00456-PSF-MJW)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HOLMES**, **HOLLOWAY**, and **SEYMOUR**, Circuit Judges.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Deborah Steele appeals from the district court's order granting summary judgment for defendant on her claims for sex discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17; age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (ADEA); retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a); and retaliation in violation of the ADEA, 29 U.S.C. § 623(d). We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

**FACTS**

## 1. Background

In August 1999, Ms. Steele began work as a sales representative for Ascent Entertainment, which operated the Pepsi Center arena in Denver, Colorado. She was responsible for non-sports group and VIP ticket sales. In this position, she reported to Paul Andrews, Vice President of Ticket Sales and Operations for Ascent. After Kroenke Sports Enterprises (Kroenke Sports) acquired the Pepsi Center in 2000, it employed Ms. Steele. Paul Andrews continued to supervise her.

By December 2001, Ms. Steele had been promoted to Director of VIP sales. Her duties included selling memberships to the All Access Club, a membership club that allows its members to obtain concert tickets directly from the Pepsi Center in advance of the general public. She also sold concert tickets to All Access Club members. In this position, Ms. Steele reported primarily to Doug

Ackerman, the Vice President of Arena Finance, and indirectly to Mr. Andrews. Messrs. Andrews and Ackerman in turn reported to David Ehrlich, Kroenke Sports's Executive Vice President.

Until the end of September 2003, things went well for Ms. Steele as an employee of Kroenke Sports. She received excellent performance reviews for 2000 through 2003. On September 14, 2003, she received a salary increase to $50,000 plus commissions and a $500 bonus.

## 2. The ULP Position

The parties agree that prior to the events of September 2003, Ms. Steele received assistance with her duties from Kate Becker.[1] At some point prior to the end of September 2003, Ms. Becker expressed her intention to look for another job because she wanted to go into sales or management. Mr. Ackerman did not want to lose her as an employee. A possible solution to this dilemma surfaced when a position selling corporate sponsorships at the Universal Lending Pavilion (ULP) became available.

---

[1]     Ms. Steele asserts that she "supervised" Ms. Becker, who she describes as her assistant, and three sales representatives. Aplt. Opening Br. at 4. This testimony is significant because she claims she later lost "her" assistant. In his deposition testimony, however, Mr. Ackerman described Ms. Becker as *his* administrative assistant and stated that Ms. Steele had no supervisory responsibility over her. In her deposition testimony, Ms. Steele agreed that it was "really Mr. Ackerman" who supervised Ms. Becker. Aplt. App., Vol. I, at 146 (depo. p. 133). While the three sales people "reported" to Ms. Steele, she admitted that she did not evaluate them or do performance appraisals for them.

ULP was a fifty-fifty partnership between Kroenke Sports and Clear Channel. Mr. Ehrlich of Kroenke Sports and Chuck Morris of Clear Channel had joint decision-making power over the corporate sponsorship position. Mr. Ackerman and Mr. Ehrlich believed that Ms. Steele would be ideal for this job, because she had previously done sponsorship and box seat sales at Fiddler's Green amphitheater. If she took the ULP job, Ms. Steele would continue to sell All Access Club tickets, as well as corporate sponsorships. Her change in job duties would also permit Ms. Becker to move up to a position engaging in All Access Club sales.

On September 29, 2003, Ms. Steele met with Mr. Ackerman, Ms. Becker, and Dick Brockmeier, Senior Director of Arena Finance, in Mr. Ackerman's office. Mr. Ackerman and Mr. Brockmeier told Ms. Steele they wanted her to take the job at ULP. Ms. Steele was hesitant to consider the position. She thought corporate sponsorships at ULP would be a "tough sale" because of the acts being booked. Aplt. App., Vol. II, at 485.[2] She also did not know how well she would work with Tom Philand, Kroenke Sports's Vice President of Sponsorship Sales.

---

[2] She explained that one year the ULP would present concerts featuring mainstream groups like Journey, Styx, and Barry Manilow that appealed to an older, corporate clientele and the next, they would present "bands [the box holders] had never heard of." Aplt. App., Vol. II, at 488.

In a subsequent meeting, Mr. Ehrlich and Mr. Ackerman told Ms. Steele they wanted her to take the position. Mr. Ackerman testified that by the end of the meeting, *from the Kroenke Sports perspective*, Ms. Steele had been offered the job. Ms. Steele agreed to take the job and she thought the decision had been made to hire her. No salary or commission arrangements had been agreed upon, however, and the parties did not discuss terms of employment.[3] Moreover, due to the ULP partnership arrangement, before Ms. Steele could have the job, Kroenke Sports would need consent from Clear Channel.[4]

Mr. Ehrlich subsequently met for lunch with three Clear Channel employees. The Clear Channel employees informed Mr. Ehrlich that they did not want Ms. Steele to be responsible for sponsorship sales because they felt she did not have "the appropriate working relationship to take on that role, given her prior poor communication with them." *Id.*, Vol. I, at 282 (depo. p. 39).

---

[3] In her reply brief, Ms. Steele asserts that she and Messrs. Ehrlich and Ackerman discussed "who her new supervisor would be, what Steele's duties and responsibilities would be and the type of sales that Steele would be doing." Aplt. Reply Br. at 1-2. These discussions had nothing to do with compensation, the key question here. Any factual dispute created by them is not material to the outcome of this case.

[4] Ms. Steele asserts that "no mention was made of a need for Clear Channel's approval" at the meeting. Aplt. Reply Br. at 1. She cites to her deposition testimony, in which she stated that she *assumed* that Mr. Ehrlich and Mr. Ackerman were the sole decision-makers. Aplt. App., Vol. II, at 491. Her mistaken assumption obviously does not create a genuine factual dispute concerning the *reality* of the need for Clear Channel's approval, which is uncontroverted in the evidence.

Mr. Ehrlich did not challenge Clear Channel's veto of Ms. Steele. He later explained that he did not fight for Ms. Steele as a candidate because Kroenke Sports and Clear Channel had a fifty-fifty partnership and he felt that it was reasonable to give in to Clear Channel on this point.

According to Ms. Steele, Mr. Ackerman told her later that day that "it was said at lunch that [she] was not young and hip enough for the job." *Id.* at 142 (depo. p. 113). She does not know who made the statement at the luncheon.[5] Derek Carosi, a younger male candidate with less experience than Ms. Steele, was subsequently hired into the ULP sponsorship sales position.

### 3. Restructuring of Ms. Steele's Compensation

A few days later, on October 1, 2003, Mr. Ackerman notified Ms. Steele that he would be restructuring her compensation package due to declining sales of All Access Club memberships. On October 14, Mr. Ackerman and Mr. Andrews met with Ms. Steele concerning her compensation and revenue. Mr. Andrews had long felt that Ms. Steele's base salary was too high and that it should be reduced to give her more of an incentive to earn commissions through sales.

---

[5] Ms. Steele asserts that the statement was made by a Clear Channel representative, but does not know which of the three representatives present at the meeting actually made the statement.

Mr. Ackerman was also concerned about adjusting her compensation due to the declining sales of All Access Club memberships.[6]

Ms. Steele's base salary was reduced by forty percent, from $50,000 to $30,000. It was now lower than Ms. Becker's $31,000 base salary. Moreover, Ms. Becker was permitted to compete with Ms. Steele by selling All Access Club memberships. Ticket sales to the existing members of the All Access Club, however, were reserved to Ms. Steele, effectively giving her an income stream unavailable to Ms. Becker.

Mr. Andrews told Ms. Steele that she could and should make up the difference between her old and new salary by increasing her commission sales. Toward this end, he stated he was increasing her commission percentages.[7]

---

[6] In her affidavit, Ms. Steele stated, without providing specific figures, that "[d]uring the fall of 2003, the All Access Club sales were at least on par with the previous year if not exceeding them." Aplt. App., Vol. II, at 469. Mr. Ackerman, however, appears to have been concerned with a longer-term trend, for he stated in his deposition that "[i]n '01, membership was bringing in 123,000. In '03, it only brought in 102." *Id.*, Vol. I, at 217 (depo. p. 71). Ms. Steele fails to raise a genuine issue of material fact concerning Mr. Ackerman's perception that All Access Club membership sales were declining.

[7] Ms. Steele asserted at her deposition that her commission structure was actually reduced. But she presented no figures to support her statement. Aplt. App., Vol. II, at 499. During Mr. Ackerman's deposition, he presented detailed percentage figures showing how the commissions on specific sales items were increased or decreased. *Id.*, Vol. I, at 224-25 (depo. pp. 105-07).

### 4. Ms. Steele's FMLA Leave and Alleged Retaliation

Following the September 29, 2003, meeting concerning corporate sponsorship sales for the ULP, Ms. Steele began experiencing anxiety symptoms and panic attacks. She felt that Mr. Ackerman was unjustly criticizing her job performance. Interacting with him intensified her anxiety and panic symptoms. On October 20, 2003, she informed Human Resources (HR) that Mr. Ackerman's actions were causing her severe anxiety. She told them about the "young and hip" comment and the lowering of her pay and complained that Mr. Ackerman was "ignoring [her] completely, and . . . nitpicking every piece of paperwork [she] did." *Id.*, Vol. II, at 503. She asserted that Mr. Ackerman was auditing her commissions in a way he never had before. HR did not launch an investigation of her claims.

Ms. Steele later presented an HR employee with a letter from her doctor describing her symptoms and indicating that she needed time off from her job. Kroenke Sports granted Ms. Steele FMLA leave, and she was permitted to be off work for a week beginning October 27, 2003. Ms. Steele had asked that the reason for her leave be kept confidential. HR told Mr. Ackerman that she was absent on FMLA leave, but he did not know the reason for her absence.

During the week Ms. Steele was off, on October 30, 2003, she came to work to assist with a VIP party for a Simon & Garfunkel concert. That day, she was asked to meet with Mr. Ackerman and Mr. Brockmeier. Mr. Ackerman was

frustrated because he felt she had not stopped in to see him that morning, had not communicated with him about what was "going on" with her FMLA leave and had not informed him of the status of the VIP party, whether she was handling the clients, whether voicemail was being answered, and whether business was progressing. *Id.* at 588. According to Ms. Steele, he became very angry and demanded to know what was wrong with her. He stated that her lack of communication was a performance issue and threatened to "write [her] up" if she would not tell him. *Id.* at 516.

Ms. Steele, who was emotionally upset at the meeting, finally told him "my problem is with you. I have anxiety attacks, panic attacks, and every time I see you, Doug, I want to throw up." *Id.* Mr. Ackerman reacted by making Mr. Brockmeier the intermediary between them. He also informed Ms. Steele that if she needed help from Ms. Becker, she should inform him, rather than telling Ms. Becker what to do as she had in the past.

Ms. Steele asserts that while she was on FMLA leave, Ms. Becker was promoted to a sales position for the All Access Club. A meeting was held without Ms. Steele present in which the All Access sales plan was discussed for the following year. As a result of Ms. Becker's promotion, she and Ms. Steele were now "equal," except for the protection granted to Ms. Steele's existing sales accounts. *Id.* at 625. Ms. Steele saw this as a demotion.

Ms. Steele further asserts that Mr. Ackerman took a number of retaliatory actions against her, including (1) telling co-workers not to take breaks with her; (2) increasing her paperwork; and (3) "essentially question[ing] everything [she] did." Aplt. Opening Br. at 10. Ms. Steele complains that her co-workers shunned her and that she was unable to obtain the boilerplate contract she needed to sell VIP boxes at the ULP. She also complains that Mr. Brockmeier was assigned to check her commission sheets. He did not check commission sheets for Ms. Becker, apparently because she did not yet have any commissions. Aplt. App., Vol. II, at 630. Ms. Steele further asserts that her commission reports were expanded from a single one-page product to a fifty-page product that took days to complete.

### 5. Ms. Steele's Termination

Ms. Steele continued to work for Kroenke Sports under what she characterizes as "constant hostile working conditions" through February 2004. Aplt. Opening Br. at 11. Sometime around February 25, 2004, Mr. Andrews received a telephone call from an individual who stated that he worked for Alliance Tickets (Alliance), a ticket broker. This informant told him that two individuals were selling tickets to Alliance: a tall black individual named Robert and another individual named Deb.

Mr. Andrews and Mr. Ackerman testified that Kroenke Sports had an unwritten policy for its employees not to sell tickets to ticket brokers.

Mr. Andrews further stated that he explained this policy to Ms. Steele around the time that he hired her. Ms. Steele denies that such a policy existed, but does not deny that Mr. Andrews and Mr. Ackerman believed that it did.

Mr. Andrews met with the Alliance informant in person. The informant provided private telephone numbers for Alliance. He later e-mailed Mr. Andrews an Alliance fax number. Mr. Andrews and Mr. Ackerman then began an investigation into possible contacts between Kroenke Sports employees and ticket brokers.

At Mr. Ackerman's instruction, an employee of Kroenke Sports's Information Technology Department conducted a search for telephone records of all calls from company standard telephones to the phone numbers the informant had supplied.[8] The search showed that three Kroenke Sports employees had placed telephone calls to Alliance: Robert Kinnard (who is tall and African-American), Jon Moore, and Ms. Steele. Ms. Steele's fax machine had also been used in communications with Alliance. The investigation further disclosed that some of Ms. Steele's clients with credit card numbers similar to that provided by the informant had reserved tickets from the All Access Club.

---

[8] Mr. Ackerman's deposition testimony is notably ambiguous on this point. While he testified at first that all employee phone numbers were investigated, Aplt. App., Vol. I, at 226 (depo. p. 114), he later stated that they may have only checked numbers belonging to the three [sic] employees identified by the tipster, *see id.* at 230 (depo. pp. 127-28). Mr. Andrews, however, testified that the phone investigation was run "companywide." *Id.* at 190 (depo. p. 89).

As a result of the investigation, Mr. Kinnard admitted he had sold tickets to ticket brokers. He was permitted to resign his employment and received a settlement package in connection with the resignation. Mr. Moore explained that he had not sold tickets to ticket brokers and that his calls to Alliance were to purchase tickets for a current corporate client. He was not discharged, but was given a warning.[9]

On March 11, 2004, Mr. Andrews and an HR employee met with Ms. Steele. Ms. Steele confirmed that she had been selling tickets and memberships for the All Access Club to Alliance brokers. She had sold the tickets to the brokers under their individual names. All her sales were routinely reviewed by management. She contended that these sales were permissible because the owners of Alliance were season ticket holders for sports teams and members of the All Access Club. Mr. Andrews told Ms. Steele that she was suspended, pending further investigation and discussions with other Kroenke Sports executives. The following week, she was discharged for dealing with ticket brokers. After her termination, an e-mail was circulated to all employees stating that any employee caught dealing with ticket brokers would be terminated.

---

[9]    Citing to Mr. Andrews' deposition, Ms. Steele contends that "Mr. Moore was not discharged, disciplined or suspended" as a result of his involvement with ticket brokers. Aplt. Opening Br. at 12. Actually, Mr. Andrews stated that he did not know whether Mr. Moore was disciplined. Aplt. App., Vol. I, at 193 (depo. p. 96). Notes from a contemporaneous Arena Executive Meeting indicate, however, that "Moore was warned." *Id.* at 286 (depo. p. 112).

### 6. Course of Proceedings

After her termination, Ms. Steele filed this action against Kroenke Sports, Mr. Andrews and Mr. Ackerman. She asserted claims for Title VII discrimination, Title VII retaliation, ADEA discrimination, ADEA retaliation, FMLA discrimination, FMLA retaliation, and defamation. The district court subsequently granted summary judgment to defendants on all claims except for her Title VII and ADEA discrimination claims relating to her reduction in compensation and termination. These claims were presented to a jury, which found for defendants. Ms. Steele does not appeal from the jury verdict. She appeals the grant of summary judgment only as to her Title VII and ADEA discrimination claims relating to denial of the ULP position, and her Title VII and ADEA retaliation claims pertaining to the alleged harassment and termination.

## ANALYSIS

### 1. Standard of Review

"We review de novo the district court's summary judgment decision, applying the same standard as the district court." *Butler v. Compton*, 482 F.3d 1277, 1278 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We examine the record and all reasonable inferences that

might be drawn from it in the light most favorable to the non-moving party. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006). Finally, we may affirm on any basis supported by the record, even though not relied on by the district court. *Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1163 n.17 (10th Cir. 2004).

## 2. Denial of ULP Position

Ms. Steele contends that Kroenke Sports discriminated against her on the basis of her age and sex by denying her the ULP position.[10] To establish a prima facie case based on a discriminatory adverse employment action, Ms. Steele must show that (1) she belongs to a protected group; (2) her job performance was satisfactory; (3) adverse employment action was taken against her; and (4) the action was taken under circumstances that give rise to an inference of discrimination. *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173-74 (10th Cir. 2005). Only the third element is at issue here. Kroenke Sports concedes that she has established the remaining elements of the analysis. Aplee. Br. at 19.

---

[10] The parties do not treat her argument about the denial of the position as a failure-to-promote or failure-to-hire claim. Instead, along with the district court, they consider the failure to hire Ms. Steele for the ULP job as a discriminatory adverse employment action, akin to being disciplined or denied a benefit by her employer on the basis of her age or sex. Were we to view Ms. Steele's claim as one for failure to promote, her prima facie case would require her to show that (1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified, she was rejected; and (4) after she was rejected, the position was filled or remained open. *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1306-07 (10th Cir. 2005).

-14-

The district court found that she failed to meet this third element because the denial of the ULP position was not a materially adverse employment action.

At the outset, we are faced with a disagreement among the parties as to the extent of the "adverse employment action." Kroenke Sports argues that the alleged action consisted simply of denying Ms. Steele the position with ULP. Ms. Steele takes a broader view: that Kroenke Sports "ordered her to take [the] new position [with ULP] and promoted a younger worker [Ms. Becker] into a position to take over many of [Ms.] Steele's prior duties and sales pool. Shortly thereafter, Kroenke Sports revoked its own decision and thereby placed [Ms.] Steele in the undisputed position of earning less money with a decreased sales base." Aplt. Reply Br. at 7. Kroenke Sports contends that Ms. Steele has waived this argument, because her argument to the district court focused solely on the denial of the position with ULP.[11] Ms. Steele responds that she "presented all of the facts necessary to support the argument and specifically referred to the argument" in the district court. *Id.* The fact remains, however, that she did not actually make the expanded argument to the district court, and therefore gave the district court no opportunity to consider it. *See* Steele's Summary Judgment Resp. Br., Aplt. App., Vol. II, at 427-30. Accordingly, we will limit our

[11] This argument differs from Ms. Steele's "reduced compensation" discrimination argument, based on the reduction of her base salary from $50,000 to $30,000. The district court permitted Ms. Steele to present this claim to a jury. The jury found in favor of Kroenke Sports.

-15-

consideration to whether Ms. Steele has demonstrated that the denial of the position with ULP constituted discrimination within the meaning of Title VII or the ADEA.

The substantive anti-discrimination provisions of Title VII are limited "to [adverse] actions that affect employment or alter the conditions of the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2412 (2006). We examine claims of adverse action on the basis of race or sex on a case-by-case basis, "examining the unique factors relevant to the situation at hand." *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998). In *Sanchez*, we held that a female teacher denied transfer to a position with the same salary and benefits and substantially similar duties did not suffer an adverse employment action because the desired position would have been "a purely lateral transfer." *Id.* We explained that "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." *Id.* at 532 n.6.

Ms. Steele contends that denial of the ULP position was adverse to her because the position would have given her the opportunity to earn increased commissions. In her affidavit submitted in opposition to summary judgment, she stated, "I viewed the ULP position as taking on additional responsibilities and

the potential to make more money" and "I further understood there would be no change in my base pay but that the opportunity would allow for an increased commission potential." Aplt. App., Vol. II, at 469-70.

These statements contradict her earlier deposition testimony. At her deposition, Ms. Steele stated that she and Mr. Ehrlich did not discuss the salary, the commission arrangement, or the terms of employment for the ULP position. *Id.*, Vol. I, at 143 (depo. p. 117). She was reluctant to take the position because she thought the corporate sponsorships would be a "tough sale." *Id.* at 141 (depo. p. 106).

A contrary affidavit will be disregarded when a court determines that it represents an attempt to create a sham fact issue. *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* There is no reason to believe that Ms. Steele did not know of her "increased commission potential" at the time of her deposition. We discern no confusion that needed to be clarified concerning her earlier testimony. We must therefore disregard the statements in her affidavit that contradicted her earlier deposition testimony.

Ms. Steele's statements at her deposition were also consistent with Mr. Ackerman's deposition testimony. He testified that Ms. Steele could "generate significant revenue" in the ULP position, and she was "ready to try it," *id.*, Vol. I, at 221 (depo. p. 85), but he did not indicate that he told her the job would be more lucrative than her existing employment. Other than Ms. Steele's affidavit, which impermissibly contradicts her deposition testimony, we have found no evidence in the summary judgment record to substantiate her claim that the ULP position would have been more lucrative than her existing position. She fails to assert any other basis for concluding that her failure to obtain the ULP position represented an adverse employment action.

### 3. Direct Evidence of Discrimination

Ms. Steele further argues that she has presented direct evidence of age discrimination, in the form of the comment by an unnamed Clear Channel employee that she was not young and hip enough for the ULP job. "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Hall v. United States Dep't of Labor*, 476 F.3d 847, 854 (10th Cir.) (quotation omitted), *cert. denied*, 128 S. Ct. 489 (2007). It includes "oral or written statements on the part of a defendant showing a discriminatory motivation." *Id.* at 855 (quotation omitted).

Assuming that the loss of a position that she was reluctant to accept and that she has failed to show would be more remunerative than her existing job constituted "discrimination," Ms. Steele's direct evidence claim still fails because there is insufficient evidence to attribute the comment by an unnamed Clear Channel employee to Kroenke Sports. Kroenke Sports cannot be held directly liable for the comment, which was not made by its personnel. The evidence shows, in fact, that the Kroenke Sports employees present at the meeting with Clear Channel advocated for Ms. Steele's hiring. There is no evidence that they were capable of unilaterally overriding Clear Channel's veto of Ms. Steele. *See Sandoval v. City of Boulder*, 388 F.3d 1312, 1321-22 (10th Cir. 2004) (rejecting Title VII liability for city police department, notwithstanding discriminatory comments made during interview by non-city personnel on committee that refused to hire plaintiff, where city advocated for plaintiff and was unable to control hiring decision made by committee).[12]

### 4. Retaliation Claims

To establish a prima facie case of retaliation under Title VII or the ADEA, Ms. Steele had to show that "(1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee

---

[12] *Sandoval* further indicates that an employer may be held vicariously liable for comments made by a decision-maker where the two employers constitute either a "single employer" or a "joint employer." *Sandoval*, 388 F.3d at 1322-24. Ms. Steele does not provide such a vicarious liability analysis, however.

-19-

would have found material; and (3) a causal nexus exists between her opposition and the employer's adverse action." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007); *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122-23 (10th Cir. 2007). The district court granted Kroenke Sports summary judgment on Ms. Steele's retaliation claim by applying elements one and three of the prima facie analysis.

Ms. Steele asserted three separate instances of protected conduct. Applying the first element of the prima facie analysis, the district court concluded that two of Ms. Steele's alleged protected activities–complaining to Mr. Ackerman about the ULP position and complaining to him about her salary reduction–could not form the basis of a retaliation claim because she did not allege that she ever mentioned sex or age discrimination. With regard to her third alleged protected activity–her complaint to HR on October 20, 2003, regarding the "young and hip" comment–the district court found the third element of causal nexus absent, reasoning that the only adverse action after her complaint to HR was her termination in March 2004, and these two events were not sufficiently close in time to establish the requisite causal nexus.

Ms. Steele first contends that the district court ignored an additional example of her protected opposition to discrimination. She says she complained to Mr. Ackerman after he informed her that she was not considered "young and hip enough" for the position that the decision was unfair and that she expressed

her disagreement about Mr. Carosi obtaining the position. The district court did not ignore this evidence, however. It specifically found that the alleged complaint to Mr. Ackerman did not constitute protected activity, because Ms. Steele did not mention sex or age discrimination and only complained that the action was "unfair." *See* Aplt. App., Vol. III, at 888; *see also* Aplt. App., Vol. II, at 470 (Ms. Steele's affidavit); *Petersen v. Utah Dep't of Corrs.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (concluding that the absence of a reference to unlawful discrimination precludes a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee at least in part is engaging in protected opposition). We agree with the district court's analysis.

Ms. Steele further asserts that she presented evidence of a pattern of retaliatory conduct that began after her protected comments to Mr. Ackerman and continued thereafter with a variety of increasingly adverse actions, culminating in her termination. We have recognized that a pattern of adverse personnel actions over a period of weeks or months may demonstrate an employer's retaliatory animus notwithstanding the absence of close temporal proximity between the employee's initial protected activity and the employer's ultimate decision to terminate the employee. *See, e.g., Marx v. Schnuck Markets*, *Inc.*, 76 F.3d 324, 329 (10th Cir. 1996). This case, however, is not such a "pattern of retaliatory conduct" case. First, as we have seen, she fails to show that the pivot on which

she wishes to anchor her claim of retaliatory pattern, her alleged complaints to Mr. Ackerman, actually constituted protected activity.

Moreover, most of the significantly adverse actions of which she complains occurred *before* her first proven protected action: her October 20, 2003, complaint to HR about the "young and hip" comment. Prior to that date, her compensation had already been reduced and her status adjusted with regard to Ms. Becker. Mr. Ackerman's alleged nitpicking of her work and ignoring her also began prior to her complaint to HR. *See* Aplt. App., Vol. I, at 148-49 (depo. pp. 145-47).

Most of the actions taken between the time Ms. Steele complained to HR and her termination were not, even taken in the aggregate, "materially adverse to a reasonable employee." *Burlington N.*, 126 S. Ct. at 2409. To qualify as retaliatory, actions "must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* Ms. Steele complains that Mr. Ackerman snubbed her and used Mr. Brockmeier as an intermediary after she told him that he made her sick. This sort of personality conflict did not constitute a materially adverse action. *See id.* at 2415. Nor was his alleged instruction to her co-employee not to join her on smoking breaks more than a "nonactionable petty slight." *Id.* While Kroenke Sports held a planning meeting during Ms. Steele's FMLA leave, which she was unable to attend, other meetings continued after she returned to work and she did attend those. Finally, although Mr. Ackerman gave Ms. Steele a verbal warning because she did not

-22-

communicate with him about her FMLA leave, there is no evidence of any further discipline or other adverse impact as a result of this incident.

As to other incidents that could be viewed as materially adverse, Kroenke Sports provided an unrebutted, non-retaliatory explanation. Ms. Steele complains that she could not obtain the revised box sales contract for the ULP she needed to make certain sales. But the evidence shows that the contract was under revision. There is no evidence that other employees had access to the revised contract or used it during the time that it was unavailable to Ms. Steele.

Ms. Steele complains of new audits of her commissions. The evidence shows these were part of the alteration of her commission structure. The commission structure alteration occurred before her HR complaint. Moreover, Ms. Becker was subject to being audited as well as Ms. Steele.

Ms. Steele complains that beginning in November 2003, she had to complete reports that listed each individual ticket order for the month, rather than being permitted to attach photocopies of the ticket orders behind a single-page summary sheet as she had in the past. Again, this additional paperwork appears to have been required in connection with documentation required under the new commission structure.

In sum, we conclude that Ms. Steele has failed to demonstrate that most of the incidents of which she complains could be considered materially adverse for purposes of our retaliation analysis. Kroenke Sports has provided unrebutted

-23-

non-retaliatory explanations for the remaining incidents.  Finally, we agree with the district court that Ms. Steele failed to establish the requisite causal nexus between her HR complaint and her termination, which occurred over five months after the complaint.

The judgment of the district court is AFFIRMED.

Entered for the Court


William J. Holloway, Jr.
Circuit Judge