**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

RICK BJORKLUND,

Plaintiff-Appellee,

v.

RANDI MILLER, individually and in
her official capacity as former
Chairperson and current Member of
the Tulsa County Public Facilities
Authority,

Defendant-Appellant,

JOHN SMALIGO, Chairman of the
Tulsa County Public Facilities
Authority; JAMES C. ORBISON,
Vice-Chairman of the Tulsa County
Public Facilities Authority; FRED
PERRY, Secretary of the Tulsa County
Public Facilities Authority,

Defendants.

No. 11-5037
(D.C. No. 4:08-CV-00424-TCK-PJC)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel.  It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Before **KELLY**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and **MATHESON**, Circuit Judge.

Rick Bjorklund brought this civil rights suit pursuant to 42 U.S.C. § 1983 against four public officials associated with his former employer, the Tulsa County Public Facilities Authority ("TCPFA"). In his complaint, he charged that the officials had terminated his employment and deprived him of a liberty interest in his reputation and good name without affording him due process of law. The defendants moved for summary judgment. The district court granted their motion as to all claims except two: a deprivation-of-property-interest claim against defendant Randi Miller in her individual and official capacities, and a deprivation-of-liberty-interest claim against Ms. Miller in her individual capacity. Ms. Miller appeals the district court's denial of qualified immunity on the individual-capacity claims. We affirm.

## BACKGROUND

### 1. The Employment Agreement

The TCPFA is a public trust organized under Oklahoma law. It manages activities on the Tulsa County Fairgrounds and other property in Tulsa County, Oklahoma. The TCPFA is governed by its Board of Trustees. During the time period relevant to this action, the Board included Ms. Miller and the other three defendants named in Mr. Bjorklund's complaint.

-2-

On January 1, 2007, the TCPFA employed Mr. Bjorklund as its President and Chief Executive Officer. The TCPFA and Mr. Bjorklund executed a written Employment Agreement ("Agreement") that provided him with a five-year term of employment. Aplt. App., Vol. IV at 829.[1] The Agreement required Mr. Bjorklund to perform the usual duties associated with his position and also other duties as assigned by the TCPFA. *Id.* at 828. He agreed to act faithfully and industriously and to perform these duties to the TCPFA's reasonable satisfaction.

The Agreement listed six circumstances under which the TCPFA had "the right to terminate this Agreement at any time, without notice." *Id.* at 833. One of these circumstances would occur "[i]f [Mr. Bjorklund should] violate any of the provisions of this Agreement or if [Mr. Bjorklund should], by misconduct or negligent inattention to the rendering and performance of his responsibilities hereunder, injure the business or goodwill of [the TCPFA] or hinder the accomplishment of [the TCPFA's] objectives." *Id.*

---

[1] Although the Agreement provided Mr. Bjorklund with employment for five years, it also provided that after the third year, the Agreement would be automatically renewed for additional periods of one year, "provided neither party submits a written notice of termination to the other party not less than sixty (60) days prior to the end of the then current calendar year." Aplt. App., Vol. IV at 829. This provision is not directly at issue in this appeal.

## 2. The "Big Splash" Account

As part of his duties, Mr. Bjorklund managed the account of the TCPFA's tenant, Expo Water Park, Inc., also known as Big Splash Water Park ("Big Splash"). Big Splash's lease required it to make annual rent payments to the TCPFA no later than October 15 of each year. On October 15, 2006, shortly before the commencement of Mr. Bjorklund's employment, Big Splash failed to make its annual rent payment.

One of Mr. Bjorklund's duties as President and CEO of the TCPFA was to distribute to its trustees monthly statements detailing the TCPFA's financial status. These statements included a section entitled "Summary Aging of Accounts Receivable," which listed by name accounts payable to the TCPFA that were more than sixty days overdue. Preston Jackson, the TCPFA's controller, prepared these monthly financial statements. Mr. Jackson reported directly to Mr. Bjorklund.

After the Big Splash account became more than sixty days overdue, the account began appearing in the "Summary Aging of Accounts Receivable." Mr. Bjorklund asserts that in January 2007, he had a telephone conversation with Big Splash's then-owner concerning the unpaid rent. During the conversation, the owner promised to pay half of its overdue rent immediately and to provide a check post-dated to June 2007 for the remainder of the rent. The owner provided

the two checks as promised.  Mr. Bjorklund did not notify the Board of this arrangement.

Mr. Bjorklund alleges that in June 2007 he had another conversation with Big Splash's owner.  During this conversation, the owner informed Mr. Bjorklund that the post-dated check would not clear and asked Mr. Bjorklund not to deposit it.  Acting on Mr. Bjorklund's instructions, Mr. Jackson retrieved the check from the bank where it had been sent for deposit.

Mr. Bjorklund consulted with Ms. Miller, who was then Chairman of the TCPFA's Board, about the Big Splash rent issue.  According to Mr. Bjorklund, Ms. Miller told him, "[W]ell, we need to just keep it off the radar."  *Id.*, Vol. II at 239.  Mr. Bjorklund understood her to mean that he should not let the unpaid rent become "a spectacle," and that he should not "let it be public."  *Id.* at 239-40.

Mr. Bjorklund passed on to Mr. Jackson Ms. Miller's admonition to keep the Big Splash account "off the radar."  In response to this instruction, Mr. Jackson removed the account from the "Summary Aging of Accounts Receivable" section of the monthly financial statements, and placed it in a different category.  In this new category, the debt to Big Splash was not specifically identified by name.  *See id.*, Vol. I at 103.

### 3.  The "Big Splash" Investigation

In August 2007, a local television station filed an Open Records Act request with the TCPFA seeking information on all payments from Big Splash to

the TCPFA between 2000 and the date of the request. Even though he was still holding the post-dated rent check from Big Splash, Mr. Jackson erroneously reported in response to this request that Big Splash had made its full rent payment due in October 2006. On October 15, 2007, Big Splash again failed to make its annual rent payment.

During the first half of 2008, the TCPFA's Board and its legal counsel, Thomas Hilborne, received information suggesting that Big Splash was suffering financial difficulties. Board members also became aware that Big Splash had failed a safety inspection by state inspectors. At the end of June 2008, Mr. Bjorklund contacted Mr. Hilborne to discuss with him issues surrounding the Big Splash account.

On June 27, 2008, acting on instructions from Mr. Hilborne, Mr. Bjorklund spoke with John Smaligo, who was by then the Board's Chairman. He informed Mr. Smaligo of the uncashed check from Big Splash, its subsequent failure to pay rent for 2007, and the fact that this delinquency had been placed "off the radar." Later that day, Mr. Bjorklund, Mr. Jackson, Mr. Hilborne and Mr. Smaligo met and discussed the Big Splash account, including the removal of the account from the "Summary Aging of Accounts Receivable" section of the monthly financial statements and Mr. Jackson's inaccurate response to the Open Records Act request concerning Big Splash's rent payments.

On the following day, a newspaper article appeared in the *Tulsa World* entitled "Big Splash late on 2007 rent." Aplt. App., Vol. VI at 1459. The article reported on the delay in Big Splash's payment of its 2006 rent as well as its delinquency for 2007. It noted that Big Splash owed the TCPFA $130,657. The article quoted both Mr. Smaligo and Mr. Bjorklund concerning the problems with the Big Splash payments. Mr. Bjorklund stated that the 2006 check had finally been cashed, "but he had no ready explanation for why it had taken so long." *Id.* He denied that the TCPFA had held the check as a favor to Big Splash. *Id.* at 1460.

### 4. The TCPFA Meeting

The TCPFA Board was scheduled to meet a few days later, on July 1, 2008. On June 30, Mr. Hilborne instructed Mr. Bjorklund's assistant to add an item to the meeting agenda. The new item indicated that the Board would "[v]ote to convene executive session to discuss the employment, hiring, appointment, promotion, demotion[,] disciplining or resignation of chief executive officer and/or comptroller pursuant to Title 25, Oklahoma Statutes 2001, Section 307(B)(1)." *Id.*, Vol. IV at 1061. The morning of the 30th, Mr. Bjorklund's assistant provided him with a copy of the revised agenda.

During the Board meeting the next day, the Trustees convoked a private executive session to discuss the employment of Mr. Bjorklund and Mr. Jackson. Mr. Bjorklund was called into the session and questioned about the issues with

-7-

Big Splash. He expressed remorse for his actions, and apologized to the Board. When asked repeatedly who had instructed him to hold the Big Splash rent check and to remove Big Splash from the "Summary Aging of Accounts Receivable" section of the monthly report, he allegedly turned to Ms. Miller and stated, "Randi, it was you and you know it. You told me to get it off the radar." *Id.* at 938. Ms. Miller responded by denying this allegation.

Following the executive session, Ms. Miller moved to terminate Mr. Bjorklund's employment. The Board voted unanimously to terminate his employment for directing that the Big Splash check not be deposited, causing false financial information to be reported to the Board, effectively extending the terms of the contract with Big Splash by failing to collect the overdue rent, and causing the false reporting in response to the Open Records Act request regarding Big Splash's 2006 rent payment.

### 5. The *Tulsa World* Articles

On July 10, 2008, just over a week after Mr. Bjorklund's termination, the *Tulsa World* published an article entitled "Ex-Expo Square exec says commissioner ordered him to ease off Big Splash." *Id.*, Vol. III at 765. In the article, Mr. Bjorklund was quoted as stating Ms. Miller told him to "[e]ase up on [Big Splash] and get it off the radar." *Id.* When asked about this, the article stated, Ms. Miller "denied she ever told [Mr.] Bjorklund to cover up anything." *Id.* She called the accusation "a blatant lie." *Id.*

A second article appeared the following day, entitled "Bjorklund says the commissioner wanted Big Splash 'off the radar' but she says that's a lie." *Id.* at 767. This article repeated Mr. Bjorklund's statement that Ms. Miller had told him to keep Big Splash's financial troubles "off the radar," and again published Ms. Miller's response that this was "a blatant lie." *Id.* The disagreement between Mr. Bjorklund and Ms. Miller was also discussed in a third and a fourth article. *See id.* at 769-70; Vol. V at 1241-42. Mr. Bjorklund asserts that as the result of this "negative media attention" he has been unable to find employment and has been informed that he is "no longer marketable." Aplt. Opening Br. at 7-8.

## ANALYSIS

### 1. Jurisdictional Issue

"Qualified immunity protects governmental officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010) (internal quotation marks omitted). In order to avoid subjecting officials to "the travails of extended litigation," an official denied qualified immunity need not wait until final judgment in the action but is permitted instead to seek interlocutory review of legal determinations underlying the denial. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). In the course of exercising such interlocutory review, "[a]lthough we lack

jurisdiction to review the district court's rulings on the sufficiency of the evidence, we nevertheless may determine whether a given set of facts violates a clearly established constitutional right." *Id.* (citation omitted). "Insofar as we have jurisdiction to review the denial of a qualified-immunity motion for summary judgment, our review is de novo." *Deutsch v. Jordan*, 618 F.3d 1093, 1099 (10th Cir. 2010).

Mr. Bjorklund contends that this court lacks jurisdiction over this interlocutory appeal because Ms. Miller merely takes issue with the district court's determinations concerning the sufficiency of the evidence. We disagree. Our review reveals that, taking the facts in the light most favorable to Mr. Bjorklund, Ms. Miller's alleged conduct did violate his clearly-established constitutional rights. Accordingly, we have jurisdiction over this appeal, but we must also affirm the denial of qualified immunity at the summary judgment stage.

### 2. Property Interest Claim

Mr. Bjorklund asserts that Ms. Miller deprived him of his property interest in his job without due process of law by recommending that he be terminated and by voting to terminate his employment when she was personally biased against him. "To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Riggins*,

572 F.3d at 1108 (internal quotation marks omitted).  We begin with the first factor.  "A property interest includes a legitimate claim of entitlement to some benefit created and defined by existing rules or understandings that stem from an independent source such as state law." *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1216 (10th Cir. 2003).

### A.  Existence of Protected Interest

During the first three years of the Agreement at issue here, the TCPFA could terminate Mr. Bjorklund's employment only for cause, based on the existence of one or more of six enumerated circumstances.  Such provisions have been held to create a property interest under Oklahoma law.  *See, e.g., Hennigh v. City of Shawnee*, 155 F.3d 1249, 1255 (10th Cir. 1998) (holding plaintiff had property interest under Oklahoma law in his rank as police lieutenant, where collective bargaining agreement contracted pursuant to state legislation provided for his demotion only for cause).

Ms. Miller asserts, however, that the Agreement did not grant Mr. Bjorklund a property interest in continued employment because the provision that listed the six permitted reasons for termination of Mr. Bjorklund's employment also stated the TCPFA could terminate the Agreement "without notice" if one of these circumstances existed.  *See* Aplt. App., Vol. IV at 833.  The district court rejected this argument, noting that defendants had failed to cite any authority holding that the mere insertion of the phrase "without notice" in an

-11-

employment contract otherwise permitting termination only for cause eliminates the employee's property right in his employment. *See id.*, Vol. VI at 1437. We agree that Ms. Miller's position is untenable. We also note that her interpretation of the Agreement puts the cart before the horse.

In order to invoke the "without notice" provision, the TCPFA was first required to determine that one of the six enumerated circumstances justifying termination of Mr. Bjorklund's employment was present. *See id.*, Vol. IV at 833. Nothing in the Agreement suggests that the TCPFA reserved the right to make this substantive determination entirely within its own discretion. Nor did the Agreement empower the TCPFA to decide this issue in bad faith, arbitrarily, or without good cause. Rather, the TCPFA was plainly required to make this substantive determination in good faith. *See Ahlschlager v. Lawton Sch. Dist.*, 242 P.3d 509, 515 n.3 (Okla. 2010) ("[E]very contract in Oklahoma contains an implied duty of good faith and fair dealing." (quotation omitted)). This gave Mr. Bjorklund an expectation of continued employment unless the TCPFA in good faith made a substantive determination that cause existed for his dismissal.

In effect, the TCPFA could only terminate the Agreement and Mr. Bjorklund's employment "without notice" *after* the determination had been made that one of the relevant circumstances existed. This discernable substantive limitation on the exercise of the TCPFA's discretion created a property interest in favor of Mr. Bjorklund in his continued employment. *See, e.g.*, *Fed. Lands Legal*

*Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1197 (10th Cir. 1999) (stating courts focus on discretion to deny benefit in assessing whether property interest exists); *see also Roth v. King*, 449 F.3d 1272, 1285 (D.C. Cir. 2006) ("[P]rotected liberty interests are created when a state places substantive limitations on official discretion" (citation omitted)).  He could only be deprived of this property interest after appropriate notice and an opportunity to be heard concerning the existence of circumstances justifying the termination.

In fact, the TCPFA's own course of conduct (notifying Mr. Bjorklund that his continued employment had been called into question, and permitting him to defend his behavior at the Board meeting) suggests it understood that Mr. Bjorklund was entitled to notice and a hearing under the Agreement prior to its determination of the existence of necessary predicate facts permitting his termination "without notice."  We therefore reject Ms. Miller's argument that the "without notice" provision stripped Mr. Bjorklund of a property interest and the right to due process.

### B.  Entitlement to Unbiased Decision-Maker

We turn to the second due process factor, whether Mr. Bjorklund was afforded an appropriate quantum of process.  The Due Process Clause "requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).  "For government employees,

such a hearing requires:  (1) oral or written notice to the employee of the charges against him; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to present his side of the story." *Riggins*, 572 F.3d at 1108 (internal quotation marks and brackets omitted).

Due Process in this context also requires an impartial tribunal.  *See id.* at 1112 ("Impartiality of the tribunal is an essential element of due process.").  The presence of a single biased decision-maker taints the tribunal and therefore may result in a violation of due process, even if the other members of the panel do not independently share in her bias.  *See Hicks v. City of Watonga,* 942 F.2d 737, 748 (10th Cir. 1991).  The district court determined that, while the other elements of due process were satisfied, genuine issues of material fact remained concerning whether Ms. Miller was an unbiased decision-maker.

Relying on dicta in *Riggins*, Ms. Miller contends that as a matter of law an employee has no due process right to an unbiased *pre-termination* decision-maker.[2]  Were we to adopt the broad conclusion that Ms. Miller draws

---

[2]     In *Riggins*, the plaintiff undertook a three-step grievance process prior to the termination of his employment.  He later argued in federal court that the officials who made the final, pre-termination decision to fire him violated his right to a fair tribunal because they were biased against him.  This court determined that the plaintiff had failed to make a substantial showing of personal bias, because "a combination of adjudicatory and investigatory functions [generally does not represent] a denial of due process." *Riggins*, 572 F.3d at 1112.  This court went on to remark, in a parenthetical citation to a Second Circuit case, "that a neutral adjudicator is not a necessary component of due

(continued...)

from the *Riggins* dicta, we would be required to overrule over thirty years of Tenth Circuit precedent holding that employees with a property interest *do* have a right to an unbiased pre-termination decision-maker.  *See, e.g., Cypert v. Indep. Sch. Dist. No. I-050*, 661 F.3d 477, 481 (10th Cir. 2011); *McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205, 1214-16 (10th Cir. 2000); *Langley v. Adams Cnty.*, 987 F.2d 1473, 1480 (10th Cir. 1993) ("[E]ven if plaintiff did receive a reasonable opportunity for a pre-termination hearing, that hearing by itself would not appear to have satisfied the county's due process obligation [because] the person terminating plaintiff . . . was not an unbiased decision-maker."); *Patrick v. Miller*, 953 F.2d 1240, 1245-46 (10th Cir. 1992); *Miller v. City of Mission*, 705 F.2d 368, 372 (10th Cir. 1983); *Staton v. Mayes*, 552 F.2d 908, 914 (10th Cir. 1977) ("The firm public statements before the [pre-termination] hearing by [a decision-maker] for the removal of [the plaintiff], and the discussions by [other decision-makers] as admitted, reveal a tribunal not meeting the demands of due process for a hearing with fairness and the appearance of fairness.").

---

[2](...continued)
process at a pretermination hearing, so long as the plaintiff is afforded a hearing before a neutral adjudicator after termination."  *Id.* at 1115 (citing *Locurto v. Safir*, 264 F.3d 154, 173-74 (2d Cir. 2001)).  This remark was dicta for two reasons:  first, in *Riggins*, the plaintiff's claim failed in any event because he did not make a sufficient showing of bias; and second, the only hearings in question in *Riggins* were the three pre-termination hearings the plaintiff received.

As one panel of this court cannot overrule another, *see United States v. Brown*, 400 F.3d 1242, 1256 (10th Cir. 2005), we must apply prior Tenth Circuit law and hold that an employee with a protected property interest in his employment is entitled to an unbiased decision-maker at his pretermination hearing. We note also that *Riggins* dicta likely has no application here in any event, because it deals with the situation where the pre-termination bias is corrected when the employee "is afforded a hearing before a neutral adjudicator after termination." *Riggins*, 572 F.3d at 1115 (citation omitted).[3] There is no indication that Mr. Bjorklund was offered such an impartial, post-termination hearing.

The next issue Ms. Miller raises is whether, taking the facts Mr. Bjorklund has alleged, he has demonstrated that she deprived him of his right to an unbiased decision-maker. In this context, "a substantial showing of personal bias is required to disqualify a hearing officer or tribunal." *Riggins*, 572 F.3d at 1112 (internal quotation marks omitted). The district court concluded that genuine issues remained concerning whether Mr. Bjorklund had made such a substantial showing, for three reasons: (1) Mr. Bjorklund personally attacked Ms. Miller during the executive session; (2) she had a personal stake and conflict of interest

---

[3] Moreover, Ms. Miller is not entitled to assert that the law was not clearly established based on the dicta in *Riggins*, because that case was decided after the events in question and many other, prior cases held to the contrary.

-16-

in seeing Mr. Bjorklund blamed for hiding the unpaid account; and (3) she was biased on the factual issue of whether she had authorized Mr. Bjorklund's actions.

Ms. Miller challenges these conclusions. She contends that Mr. Bjorklund's statements at the hearing were not "personal attacks" on her sufficient to overcome the presumption of her honesty and integrity as a decision-maker and that the dispute over her alleged instruction to him to keep the Big Splash account "off the radar" did not demonstrate a sufficient bias or conflict of interest on her part to call her impartiality into question. Having considered these arguments, we conclude that the district court reached the correct result in denying qualified immunity.

It was clearly established, at all times pertinent to this case, that a personal stake in the outcome of proceedings can create a conflict of interest sufficient to deprive an employee of an unbiased decision-maker. *See Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 520 (10th Cir. 1998). *Cf. also Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) ("[T]hose with substantial pecuniary interest in legal proceedings should not adjudicate these disputes"). One recognized form of personal stake is an attempt to seek self-vindication, a possibility long recognized in the vindictive prosecution context. *Cf., e.g.*, *United States v. Pittman*, 642 F.3d 583, 586 (7th Cir. 2011) ("Vindictive prosecution may . . . exist when it can be shown that the government's actions were motivated by the prosecutor's . . .

-17-

desire to seek self-vindication for prior errors that he may have committed in a case." (quotation omitted)).

Here, a reasonable jury could conclude that Ms. Miller faced a direct accusation from Mr. Bjorklund that she had instructed him to hide the Big Splash debt, and that she had therefore played a significant role in a potential scandal that had become public by being bruited in the local press. *See* Aplt. App., Vol. VI at 1459-60. Terminating Mr. Bjorklund's employment could serve to pin the blame on him and deflect any blame from Ms. Miller. A reasonable jury could therefore conclude that Ms. Miller had a personal stake in the outcome of Mr. Bjorklund's employment termination proceeding, and that for this reason she should have declined to participate in the proceeding. In particular, by moving that his employment be terminated and by voting for his termination she may have actively denied him his due process right to an impartial decision-maker.

### 3. Liberty Interest Claim

Mr. Bjorklund's complaint also included a claim that, in the course of terminating his employment, Ms. Miller deprived him of a liberty interest in his good name without due process. He charged that by accusing him of lying in an interview she gave to the *Tulsa World*, Ms. Miller made unfounded charges of dishonesty or immorality that seriously damaged his standing in the community and foreclosed his freedom to take advantage of future employment opportunities.

An employee has a "liberty interest in his good name and reputation as it

-18-

affects his protected property interest in continued employment." *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994). A plaintiff who asserts a "stigma-plus" claim charging infringement of this liberty interest must show both (1) government defamation and (2) an alteration of his legal status. *Guttman v. Khalsa*, ___ F.3d ___, Nos. 10-2167, 10-2172, 2012 WL 76055, at *20 (10th Cir. Jan. 11, 2012). As we formulated the test in *Workman*, in addition to meeting § 1983's "state action" requirement, the employee must show that (1) the statements impugned his good name, reputation, honor, or integrity; (2) the statements were false; (3) the statements occurred in the course of terminating the employee or will foreclose other employment opportunities; and (4) the statements were published. 32 F.3d at 481. We later clarified that the third element of this test is conjunctive, and that in order to satisfy it, the employee must show both that the defamatory statement occurred in the course of employment termination and that it will foreclose other employment opportunities. *See Guttman*, 2012 WL 76055, at *21.

## A. Lack of Request for a "Name-Clearing" Hearing

In Ms. Miller's main line of attack, she contends that Mr. Bjorklund's alleged failure to request a name-clearing hearing is fatal to his claim. The district court disagreed, opining that "[u]nder Tenth Circuit law, a request for a name clearing hearing is not a jurisdictional prerequisite to suit." Aplt. App., Vol. VI at 1450. It relied on *Eames v. City of Logan*, 762 F.2d 83 (10th Cir.

-19-

1985).  In that case, a district court dismissed the plaintiff's complaint under Fed. R. Civ. P. 12(b)(6), reasoning that his failure to allege that he had requested a name-clearing hearing prior to filing his complaint meant that he had failed to state a claim for denial of a liberty interest.  On appeal, we reversed, holding that the employee's "failure to earlier request a name-clearing hearing does not defeat his claim.  He may still be entitled to a hearing if he can prove at trial that his liberty interest was indeed violated." *Id.* at 86.

Ms. Miller opposes reliance on *Eames* here, for several reasons.  First, she contends that *Eames* should be distinguished from this case because *Eames* involved a dismissal at the pleading stage, whereas Mr. Bjorklund was afforded additional time during summary judgment proceedings in which he could have requested a name-clearing hearing.  Under our holding in *Eames*, however, this consideration is a distinction without a difference.  We noted in that case that the employee might still be entitled to a hearing even if he could prove *at trial* that his liberty interest had been violated.  *Id.*

Ms. Miller also argues that *Eames* is a "30-year-old decision," Aplt. Opening Br. at 38, and that decisions in other circuits since *Eames* have held that failure to request a name-clearing hearing prior to filing suit waives an employee's liberty interest claim.  Because *Eames* has never been overruled, however, we must follow it notwithstanding its age or contrary authority in other circuits.  *See Brown*, 400 F.3d at 1256.

-20-

Finally, Ms. Miller suggests that the better rule is one applied in the related context of deprivation of a protected property interest, citing *Sandoval v. City of Boulder*, 388 F.3d 1312 (10th Cir. 2004). In *Sandoval*, we held that where an employee failed to request a hearing to contest a decision not to promote her to an executive director position, she waived her procedural due process claim by failing to request the hearing to which she claimed she was entitled. *Id.* at 1329. *Sandoval* was decided in the context of a procedural due process claim and did not purport to overrule *Eames*. We therefore agree with the district court that *Eames*, not *Sandoval*, governs here.

### B. Statements Made in Course of Termination

Ms. Miller next contends that Mr. Bjorklund failed to show that her statements to the *Tulsa World* were made in the course of the termination of his employment. As the district court noted, in determining whether this element was met we "must examine both the nature and the timing of [the] allegedly defamatory statement." Aplt. App., Vol. VI at 1452 (quoting *Renaud v. Wyo. Dep't of Family Servs.*, 203 F.3d 723, 727 (10th Cir. 2000)).

"[P]ublication of defamatory statements need not be strictly contemporaneous with a termination to occur in the course of the termination of employment." *Renaud*, 203 F.3d at 727. A "roughly contemporaneous statement[]" made "incident to the termination" that concerns the "manner or reasons for [the employee's] termination" may qualify as one made "in the course

of termination of employment." *Id.* (internal quotation marks omitted). Ms. Miller contends that, irrespective of timing, the statements here fail the "nature of the statement" test because they had "nothing to do with the reasons for [Mr. Bjorklund's] termination." *Id.* She argues that Mr. Bjorklund was not terminated for lying and her accusation that he had lied was therefore irrelevant to the reason for his termination.

The district court disagreed with this position, however, reasoning that whether Ms. Miller told Mr. Bjorklund to keep the Big Splash delinquency "off the radar" was an issue injected into the termination process during the termination hearing. The district court opined that given the facts alleged by Mr. Bjorklund "a jury could conclude that [Ms.] Miller's statements involved the reasons for [Mr. Bjorklund's] termination and were made incident thereto." Aplt. App., Vol. VI at 1452. Although the district court phrased its decision in terms of what a jury could conclude, the question of whether Ms. Miller's statement was made in the "course of termination of employment," given Mr. Bjorklund's version of the facts, involves an abstract legal issue that we may review in this interlocutory appeal. *Cf. Deutsch*, 618 F.3d at 1099 (characterizing question of whether plaintiff's testimony was "on a matter of public concern" as an abstract legal issue reviewable on qualified immunity appeal).

We agree with the district court that the facts alleged by Mr. Bjorklund satisfy the third element of the *Workman* test, as explicated in *Renaud*, which was

clearly-established law in this circuit at the time of the events in question. The statements that Ms. Miller made to the newspaper essentially involved Mr. Bjorklund's defense against or attempt to mitigate the charges against him that were asserted during the pre-termination hearing. We also note that Ms. Miller denied Mr. Bjorklund's assertions at the hearing rather than simply dismissing them as irrelevant. We therefore reject Ms. Miller's contention that she was entitled to qualified immunity on the basis that her statements were not made during the course of terminating Mr. Bjorklund's employment.

### C.  Statement Made "Under Color of State Law"

Ms. Miller also argues that her statements were not made "under the color of state law" as required for a liberty interest, "stigma-plus" claim. Aplt. Opening Br. at 42. "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks omitted).

Ms. Miller contends that, although the article identified her as a county commissioner and a member of the TCPFA Board, her statements to the *Tulsa World* involved a purely private act in response to an interview initiated by the newspaper rather than an action taken by Ms. Miller under the color of her official position. The district court rejected this argument, noting several factors

that tended to show Ms. Miller was acting under color of state law when she made the challenged statements:

> In the 7/10/08 Article, in which [Ms.] Miller first stated that [Mr. Bjorklund] had told the newspaper a "blatant lie," [Ms.] Miller was identified as a "County Commissioner," a current member of "the board," and the "fair board chairwoman in 2007." All of [Ms.] Miller's comments are directly related to her official role and duties as a TCPFA Trustee. But for [Ms.] Miller's position of county authority, she would have had no occasion to be interviewed or to make the allegedly stigmatizing comments about [Mr. Bjorklund]. The public battle in this case was between [Mr. Bjorklund] as a former public employee and [Ms.] Miller as a public official, rather than some type of personal, private disagreement that was divorced from [Ms.] Miller's official duties. Therefore, [Mr. Bjorklund]'s evidence could show a real nexus between [Ms.] Miller's statements and her badge of governmental authority[.]

Aplt. App., Vol. VI at 1454.

We agree with the district court that Mr. Bjorklund made a sufficient showing that Ms. Miller's comments were made under color of state law. We therefore reject Ms. Miller's argument on this point.

### D. Clearly-Established Law

Finally, Ms. Miller argues that it was not clearly established at the time she made her statements to the *Tulsa World* that a statement impugning an employee's honesty or integrity for reasons other than the specific reasons given for his termination could violate the employee's constitutional rights. Specifically, she asserts that Mr. Bjorklund was not fired for lying and so her subsequent comment that he lied does not involve a situation in which she took action to terminate his

employment "*based upon* a public statement of unfounded charges of dishonesty or immorality." *Darr v. Town of Telluride*, 495 F.3d 1243, 1255 (10th Cir. 2007) (emphasis added) (quotation omitted).

This argument reads the necessary elements of Mr. Bjorklund's liberty interest claim too narrowly. The phrase "based upon" does not import a concept of strict causation between the statement and the termination. Rather, it was well-established at the time of the events in question in this case that a liberty interest claim requires only that the accusations of dishonesty be made "in the course of terminating the employee." *Workman*, 32 F.3d at 481. We have already stated that under Mr. Bjorklund's version of the facts, Ms. Miller's comments were sufficiently related to the reason he was fired to satisfy this standard. And we have already supplied clearly-established law to support this understanding.

### CONCLUSION

We AFFIRM the district court's order denying summary judgment to Ms. Miller on the basis of qualified immunity.

Entered for the Court


John C. Porfilio
Senior Circuit Judge


-25-